No. 80,223

STATE OF KANSAS *ex rel.* NICK A. TOMASIC, WYANDOTTE COUNTY DISTRICT ATTORNEY, *Relator*, v. THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, *Respondent*.

(955 P.2d 1136)

Opinion filed March 6, 1998.

*Nick A. Tomasic*, district attorney, and *Thomas M. Martin* and *Michael P. Howe*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, argued the cause and were on the brief for relator.

*Harold T. Walker*, chief counsel, of Unified Government of Wyandotte County/ Kansas City, argued the cause, and *N. Cason Boudreau*, deputy city attorney, and *Michael M. Schultz* and *Daniel B. Denk*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, and *Kathryn Pruessner Peters* and *Norman E. Gaar*, of McDowell, Rice, Smith & Gaar, of Overland Park, were with him on the brief for respondent.

*Christopher K. McKenzie*, of Topeka, and *Donald L. Moler, Jr.*, of Topeka, were on the brief for *amicus curiae* League of Kansas Municipalities.

The opinion of the court was delivered by

ABBOTT, J.: This is an original action in quo warranto. The action was filed by Wyandotte County District Attorney Nick Tomasic seeking a ruling on the constitutionality of the Consolidation Act, K.S.A. 1997 Supp. 12-340 *et seq.*, which authorized a procedure whereby the voters of Wyandotte County (County) could adopt a consolidated government for County and Kansas City, Kansas (City).

The parties filed a stipulation of facts. By way of background, we include a portion of the stipulation of facts.

"The County is comprised of 155.7 square miles and has a 1996 estimated population of 153,427. The County is the smallest county in Kansas. The County has the fourth largest population in the State of Kansas among Kansas counties.

"The County includes four (4) incorporated municipalities and a small unincorporated area of 2.7 square miles, the Loring area, which is south of Bonner Springs. The four incorporated municipalities are the City, Edwardsville, Bonner Springs and Lake Quivira.

"The City is a city of the first class. It is comprised of 127.85 [square] miles, and has a 1996 estimated population of 142,654. The City is the second largest city in Kansas in terms of population and the largest city in Kansas in land area.

"Approximately 82.1% of the County is within the geographic boundaries of the City.

"The City is the county seat of the County. The County Courthouse and most of the county officials are located in the City.

"Bonner Springs is a second class city. Its boundaries extend over Wyandotte and Johnson Counties. Its 1996 estimated population is 6,541, with 6,538 persons residing in Wyandotte County. Bonner Spring's area covers 15.8 square miles, with 15.5 square miles in Wyandotte County.

"Edwardsville is a third class city. Its 1996 estimated population is 4,097. It covers 9.2 square miles.

"Lake Quivira is a third class city. Its boundaries extend over Wyandotte and Johnson Counties. Its 1996 estimated population is 1,013, of which approximately 40 live in Wyandotte County. It covers 1.3 square miles, with .3 square miles in Wyandotte County.

"The unincorporated Loring area of the County covers 2.7 square miles. Its 1996 estimated population is 95.

. . . .

"In 1991, the City annexed 17 square miles of unincorporated land in the County, commonly known as the Piper area. See *In Re Petition of the City of Kansas City for Annexation of Land*, 253 Kan. 402, 856 P.2d 144 (1993).

. . . .

"As a result of the 1991 annexation, there were mergers of organizations and consolidation of functions. The County Sheriff's deputy patrol, the County road and bridge repair program and the County zoning function were eliminated. The Joint City-County Board of Health was eliminated and all responsibilities and facilities were transferred to the County. The City transferred all jail responsibilities to the County, by interlocal agreement. Solid waste planning vested totally in the City by interlocal agreement for county-wide purposes. The City acquired all remaining water districts in the County. A County sewer district was eliminated.

. . . .

"Pursuant to the Consolidation Act, on or about May 15, 1996, Governor William Graves appointed five (5) private citizens to form the Consolidation Study Commission of Kansas City, Kansas and Wyandotte County (the 'Commission'). The Commission members who were appointed were Rev. Robert L. Baynham, Chairman, Gary D. Grable, Vice-Chairman, Dr. Thomas R. Burke, Member, Aileen C. Eidson, Member, and Richard A. Ruiz, Member. The members were not elected officials or employees of any of the governmental entities in the County.

"The Consolidation Act charged the Commission with the responsibility to study the consolidation of the City and the County governments, or the consolidation of certain offices, functions, services and operations thereof, and to prepare

and adopt a plan addressing such consolidation of governments or offices, functions, services and operations, as deemed appropriate.

"From May through October, 1996, the Commission held public hearings and meetings for the purposes of providing and receiving information about the consolidation of governmental services. Thirty-five (35) public meetings were held at which the Commission solicited opinions and testimony from the staff and elected officials of the two governments regarding the operations and functions of City and County government, as well as from the general public and professionals in various occupations in the area.

"Following receipt of information, the Commission determined that it would be appropriate to prepare and adopt a plan addressing the consolidation of governments rather than the consolidation of functions.

"In November of 1996, pursuant to the Act, the Commission adopted a preliminary plan for the consolidation of the City and County governments. The preliminary plan was delivered to Governor William Graves and mailed to Senate President Richard Bond, Speaker of the House Tim Shallenburger, and each of the House and Senate Local Government Committees. The preliminary plan was filed with the County Election Officer, the City Clerk and each public library within the County.

"Following adoption of the preliminary plan, the Commission held three (3) public hearings to solicit public opinion about the preliminary plan. Approximately 300 people attended the first hearing, approximately 150 to 175 people attended the second hearing and approximately 250 people attended the third hearing.

"The Commission modified certain provisions of the preliminary plan following receipt of comments at the hearings.

"A Consolidation Study Report (the 'Plan') dated January 13, 1997, was prepared and adopted by the Commission. The Plan was submitted to the Kansas Governor and Legislature on January 13, 1997, by personal delivery to Governor William Graves, Senate President Richard Bond and Speaker of the House Tim Shallenburger. . . . The Plan was filed with the County Election Officer, the City Clerk and each public library within the County.

"The Plan provides for a new consolidated form of government, to be known as the Unified Government of Wyandotte County/Kansas City, Kansas (the 'Unified Government'). The existing governments of the City and the County are replaced by a governing body composed of a Mayor/Chief Executive and a ten member Unified Board of Commissioners. Eight Commission members are nominated and elected in eight newly created districts. Two County-wide Commission members are nominated from two newly created districts comprised of the four northern-most and four southern-most districts; these Commission members are elected at large. The Mayor/Chief Executive has veto power which can be overridden by a two-thirds majority of the Unified Board of Commissioners.

"The Plan provides for the appointment of a County Administrator by the Mayor/Chief Executive with the consent of the Unified Board of Commissioners.

The County Administrator is directly responsible for the daily functions of the Unified Government.

. . . .

"The Plan provides for the establishment of an Ethics Commission, the members to be appointed by the Administrative Judge of the District Court with consent of the sitting judges of the County and appointment of a Legislative Auditor also appointed by the District Court sitting judges.

. . . .

"The Kansas Legislature did not adopt a concurrent resolution on or before February 12, 1997, rejecting the Plan. Neither the Governor nor the Kansas Legislature acted in any manner on the Plan.

. . . .

"A document entitled 'Consolidation Recommendations' was prepared by the Commission and mailed to the citizens of the County prior to the April 1, 1997 election. The document stated that it was a copy of the final recommendations submitted to the Legislature and Governor on January 13, 1997, and that the only purpose of the distribution of the document was to inform recipients of the details of the Recommendations which would appear as Question 1 on the April 1, 1997 ballot. . . .

"Pursuant to the Consolidation Act, the Plan was submitted to the qualified electors of the County (which included City residents) at the April 1, 1997 election. Fifty-nine and six-tenths percent (59.6%) of the electors voting on the Plan voted in favor thereof. . . .

. . . .

"On August 4, 1997, the governing body of the City passed Charter Ordinance No. 114 repealing provisions of Charter Ordinances No. 84 and No. 90 inconsistent with the recommendations of the Commission and establishing procedures for passage of ordinances by the Unified Government. . . .

"Charter Ordinance No. 114 was published on August 17, 1997, and thus, was not effective until October 24, 1997, sixty-one (61) days after the final publication thereof pursuant to Article 12, § 5 of the Kansas Constitution.

. . . .

"The Consolidation Act provides that the Unified Government is a county with all the powers, functions and duties afforded to counties under the Constitution and laws of the State, and is also a city of the first class with all the powers, functions and duties afforded to cities of the first class under the Constitution and laws of the State. The Consolidation Act provides that upon the effective date of consolidation of the City and County governments, the territory of the Unified Government includes all of the territory of the County for purposes of exercising powers, duties and functions of a county, and all of the territory of the County, except the territory of Bonner Springs, Edwardsville, Lake Quivira and the unincorporated areas of the County for purposes of exercising the powers, duties and functions of the City.

. . . .

"The Unified Government has operated as a consolidated city/county since the effective date of consolidation.

. . . .

"Pursuant to the Plan, the elected offices of County Clerk, County Treasurer, County Surveyor and Public Administrator became appointed positions. All functions performed by these officials will be retained in the newly appointed positions. The County Administrator has established positions of Unified Clerk and Unified Treasurer in order to consolidate the duties and responsibilities of the prior County and City Clerks and the prior County and City Treasurers. The position of County Surveyor has been designated as an administrative position within the Executive Branch to be appointed by the County Administrator. The Public Administrator position and functions will be transferred to the Judicial Branch with the district court judges determining how such functions will be carried out.

"The Plan provides that several offices have been retained for county-wide elections: Sheriff, District Attorney and the Register of Deeds. The District Attorney position is retained as it presently exists. Elections for both the Sheriff position and the Register of Deeds position will be non-partisan and held during the regularly scheduled April election period; prior to consolidation, partisan elections were held for these positions during the regularly scheduled November election period. The terms of office of these two offices will continue to be four (4) years; the terms of office of the present occupants were extended until the election period of April 2001 pursuant to the Plan.

"As of the date hereof, the Unified Government has merged some City and County departments, including the parks departments, clerks departments, legal departments and personnel departments, and merged functions of many other departments. [Approximately] 2,000 employees of the Unified Government have signed up under new health care plans under which they [became] covered as of January 1, 1998. The Unified Government has issued industrial revenue bonds. It has sent tax bills and is collecting taxes. It has carried out all aspects of consolidated city-county government, has taken official actions, has entered into contracts and has prosecuted persons for violations of municipal ordinance and state law. The Unified Government is proceeding with its capital improvements program and with economic development projects and tax increment financing projects that will require the use of the powers of eminent domain and the issuance of general obligation bonds."

" 'This court has recognized on several occasions that in a proper case an original action in quo warranto is an appropriate procedure to question the constitutionality of a statute. [Citation omitted.]' " *State ex rel. Stephan v. Finney*, 251 Kan. 559, 567, 836 P.2d 1169 (1992) (quoting *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 [1984]). *State ex rel. Stephan*

*v. Parrish*, 257 Kan. 294, 297-98, 891 P.2d 445 (1995), which was also a quo warranto case, reiterated some of the general rules of constitutional construction:

" 'It is fundamental that our state constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. [*Hunt v. Eddy*, 150 Kan. 1, 90 P.2d 747 (1939); see *Leek v. Theis*, 217 Kan. 784, 539 P.2d 304 (1975); *Schumacher v. Rausch*, 190 Kan. 239, 372 P.2d 1005 (1962); *State, ex rel., v. Anderson*, 180 Kan. 120, 125, 299 P.2d 1078 (1956).]

" 'The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [*Leek v. Theis*, 217 Kan. at 784, Syl. ¶ 2; see *Rogers v. Shanahan*, 221 Kan. 221, 223, 565 P.2d 1384 (1976); *State, ex rel., v. Bennett*, 219 Kan. 285, 289, 547 P.2d 786 (1976); *Brown v. Wichita State University*, 219 Kan. 2, 9-10, 547 P.2d 1015 (1976).]

" 'In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [*State, ex rel., v. Fadely*, 180 Kan. 652, Syl. ¶ 2, 308 P.2d 537 (1957); see *Brown v. Wichita State University*, 219 Kan. 2, Syl. ¶ 3; *Leek v. Theis*, 217 Kan. at 792; *Shelton v. Phalen*, 214 Kan. 54, Syl. ¶ 5, 519 P.2d 754 (1974).]

" 'Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [*Hunt v. Eddy*, 150 Kan. 2, Syl. ¶ 7; see also *In re Estate of Diebolt*, 187 Kan. 2, 13, 353 P.2d 803 (1960); *State, ex rel., v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, Syl. ¶ 1, 296 P.2d 656 (1956); *State, ex rel., v. Board of Education*, 173 Kan. 780, 790, 252 P.2d 859 (1953).]

" 'Courts do not strike down legislative enactments on the mere ground they fail to conform with a strictly legalistic definition on technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding of the masses at the time they adopted such provisions and the presumption is in favor of the natural and popular meaning in which the words were understood by the adopters. [*Hunt v. Eddy*, 150 Kan. 2, Syl. ¶ 6; *Leek v. Theis*, 217 Kan. at 793; *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 825, 473 P.2d 97 (1970); *Wall v. Harrison*, 201 Kan. 600, 603, 443 P.2d 266 (1968); *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, 360 P.2d 456 (1961).]

" 'The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public

interest as that is a legislative function with which courts cannot interfere. [*State, ex rel., v. Fadely,* 180 Kan. at 659; see *City of Wichita v. White,* 205 Kan. 408, 469 P.2d 287 (1970); *Republic Natural Gas Co. v. Axe,* 197 Kan. 91, 415 P.2d 406 (1966); *Tri-State Hotel Co. v. Londerholm,* 195 Kan. at 760.]' " (Quoting *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20-21, 587 P.2d 844 [1978].)

Following the Act's mandate, the Commission completed the Plan, which recommended total consolidation of the governments in Wyandotte County and Kansas City, Kansas. The Commission submitted the Plan to the Governor and the legislature in a timely fashion. The legislature did not reject the Plan by concurrent resolution, and the voters of Wyandotte County voted to adopt the Plan by a margin of 60 to 40 percent. In reliance upon the voters' adoption of the Plan, the governments of Wyandotte County and Kansas City, Kansas, were consolidated into one governing body—the Unified Government. The members of the governing body of the Unified Government were sworn in on October 1, 1997, and first met on October 2, 1997.

## I. ART. 2, § 1 OF THE KANSAS CONSTITUTION

Art. 2, § 1 of the Kansas Constitution provides: "The legislative power of this state shall be vested in a house of representatives and a senate." Legislative power is the power to make, amend, or repeal laws. Executive power is the power to enforce the law, and judicial power is the power to interpret and apply the law to actual controversy. *State ex rel. Stephan v. Finney,* 251 Kan. at 577.

" 'The power to create municipal corporations, including the power to designate their boundaries and to increase or to decrease their corporate limits, is purely legislative—it is not a part of either the executive or judicial branch of government.' " *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 706, 527 P.2d 1340 (1974) (quoting *Ruland v. City of Augusta,* 120 Kan. 42, 50, 242 Pac. 456 [1926]); see also *Lampe v. City of Leawood,* 170 Kan. 251, 253, 225 P.2d 73 (1950) (the creation of a municipal corporation is a legislative function). Similarly, counties are created by the State and their powers, rights, and duties are derived from the legislature and may be changed as the legislature sees fit. *Cow Creek Valley Flood Prevention Ass'n v. City of Hutchinson,* 166 Kan. 78, 83, 200

P.2d 279 (1948). The consolidation of the governments of a city and a county is not identical to creating a new city or county or changing their boundaries. However, consolidation of city and county governments is similar enough to the legislative powers cited above that it is reasonable to conclude that consolidating the governments of a city and a county together is also a legislative power.

Courts permit the legislature to delegate certain powers to administrative agencies. However, the delegation of a power, such as consolidating the governments of a city and a county, to a private group, as opposed to an administrative agency, is improper. *Sedlak v. Dick*, 256 Kan. 779, 795, 887 P.2d 1119 (1995). Based on this distinction between a private group and a public administrative agency, the relator contends that the Commission is a private group, as opposed to a public agency or board. Thus, the relator asserts that the legislature has improperly delegated the legislative power of consolidating the city and the county governments to a private group—the Commission.

The respondent rejects this argument by claiming that the Commission is not a private group and has none of the qualities of a private entity. The respondent contends that the Commission was not an independently existing private association, partnership, or corporation. Instead, the respondent contends that the Commission was a public administrative agency, created by statute, which the legislature properly delegated power to. According to the respondent, the Commission was similar to every other public governmental task force or study commission charged with making a recommendation on governmental action.

We hold that the Commission is a public administrative agency, created by statute, which the legislature properly delegated power to. The Commission was created by the legislature, in the Act, to do as the legislature ordered. It was organized for the exclusive legislative purpose of preparing a Plan to consolidate the two governments, with its powers prescribed by statute. It did not exist prior to or independent of legislative authorization.

The Commission may not have had full accountability to the executive branch, the legislative branch, or to the voters, but it did

have some. The Governor had the power, under the Act, to appoint the members of the Commission and the implied power to remove such members. The legislature could have passed a bill disbanding the Commission. The State provided funds to the Commission, and the Commission was under an implied duty not to misuse these funds. More importantly, the Wyandotte County voters had the opportunity to approve or disapprove of the Plan. Clearly, the Commission was accountable to more than just its own organization, and it had a connection with other branches of government. Thus, the Commission was a public entity and not a private one. As such, the Act did not unconstitutionally delegate legislative power—the power to consolidate a city and county government—to a private entity in violation of art. 2, § 1 of the Kansas Constitution. This issue fails.

## II. DELEGATION OF LEGISLATIVE POWER

Legislative power is the power to make a law, as opposed to the power to enforce a law. A legislature may try to delegate the legislative power to make a law. Such a delegation is improper, unless specific constitutional authority allows the legislature to delegate its legislative power to a different branch of government. If the constitution does not authorize a delegation of such legislative power, then the delegation is improper as a violation of the separation of powers doctrine and art. 2, § 1, which vests legislative power with the legislature only. However, a legislature may delegate an administrative power to a different branch of government. Administrative power is the power to administer or enforce a law, as opposed to the legislative power to make a law. The legislature does not need constitutional authority to delegate administrative power because it is not delegating a power reserved for its branch of government under art. 2, § 1.

It is often difficult to determine if the legislature has delegated the legislative power to make a law or the administrative power to administer a law. The difference between the two types of delegated powers depends upon the amount of specific standards included within the delegation. If the legislature has included specific standards in a delegation, then it has already enacted the law and

it is simply delegating the administrative power to administer the law, based on the standards included in the delegation. On the other hand, if the legislature has not included specific standards within a delegation, then the legislature has delegated the legislative power to make the law. Such delegation is improper without constitutional authorization. *Wesley Medical Center v. McCain*, 226 Kan. 263, 270, 597 P.2d 1088 (1979); *State, ex rel. v. State Board of Education*, 215 Kan. 551, 554, 527 P.2d 952 (1974); *State, ex rel., v. Fadely*, 180 Kan. 652, Syl. ¶ 7, 308 P.2d 537 (1957); *State, ex rel., v. Hines*, 163 Kan. 300, 303, 182 P.2d 865 (1947).

A delegated power constitutes administrative power if the delegation contains sufficient policies and standards to guide the non-legislative body in exercising the delegated power. *State, ex rel., v. Bennett*, 219 Kan. 285, 300, 547 P.2d 786 (1976); see *State, ex rel., v. Fadely*, 180 Kan. at 663-64. In other words, the legislature may enact general provisions and delegate to an administrative body the discretion to " 'fill in the details' " if the legislature establishes " 'reasonable and definite standards to govern the exercise of such authority.' " *State v. Ponce*, 258 Kan. 708, 712, 907 P.2d 876 (1995) (quoting *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 956, 811 P.2d 876 [1991]); see *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 594, 808 P.2d 1355 (1991).

The relator argues that the Act contained only two stated factors to guide the Commission in the exercise of its delegated power. These factors were found in K.S.A. 1997 Supp. 12-343 and require the Commission to consider, in making a consolidation recommendation:

"(1) . . . the efficiency and effectiveness of the administrative operations of the city and county [and]

"(2) . . . the costs and benefits of consolidating the city and county or certain city and county offices, functions, services and operations."

We have said in *Guardian Title Co. v. Bell*, 248 Kan. 146, 153-54, 805 P.2d 33 (1991):

"What is required is that a statute express the law in general terms and delegate the power to apply it to an executive agency under standards provided by the legislature. *Wesley Medical Center v. McCain*, 226 Kan. 263, 270, 597 P.2d 1088

(1979). This has been the fundamental rule since early statehood. See *Coleman v. Newby*, 7 Kan. 82, 89 (1871).

"Where flexibility in fashioning administrative regulations to carry out statutory purpose is desirable in light of complexities in the area sought to be regulated, the legislature may enact statutes in a broad outline and authorize the administrative agency to fill in the details. *Nicholas v. Kahn*, 62 App. Div. 2d 302, 306, 405 N.Y.S.2d 135 (1978), *modified* 47 N.Y.2d 24, 416 N.Y.S.2d 565, 389 N.E.2d 1086 (1979).

. . . .

"Standards may be implied from the statutory purpose. *People v. Wright*, 30 Cal. 3d 705, 713, 180 Cal. Rptr. 196, 639 P.2d 267 (1982). . . .

. . . .

"The modern trend, which we ascribe to, is to require less detailed standards and guidance to the administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems. See *Kalbfell v. City of St. Louis*, 357 Mo. 986, 993, 211 S.W.2d 911 (1948); *Ward v. Scott*, 11 N.J. 117, 93 A.2d 385 (1952); *City of Utica v. Water Control Bd.*, 5 N.Y.2d 164, 182 N.Y.S.2d 584, 156 N.E.2d 301 (1959)."

Clearly, we are dealing with a complex area of law involving social and economic issues. The legislature provided for an independent public body (the Commission) to study the issue of consolidation, provided funds for a Commission staff, and gave sufficient power to the Commission to study, draft, and redraft a plan. K.S.A. 1997 Supp. 12-344 sets forth specific items the Commission, as an administrative body, was required to provide for in the Plan, should it recommend consolidation. It provides:

"(a) Any plan submitted by the commission shall provide for the exercise of powers of local legislation and administration not inconsistent with the constitution or other laws of this state.

"(b) If the commission submits a plan providing for the consolidation of certain city and county offices, functions, services and operations, the plan shall:

"(1) Include a description of the form, structure, functions, powers and officers and the duties of such officers recommended in the plan.

"(2) Provide for the method of amendment of the plan.

"(3) Authorize the appointment of, or elimination of elective officials and offices.

"(4) Specify the effective date of the consolidation.

"(5) Include other provisions determined necessary by the commission.

"(c) If the plan provides for the consolidation of the city and county, in addition to the requirements of subsection (b) the plan shall:

"(1) Fix the boundaries of the governing body's election districts, provide a method for changing the boundaries from time-to-time, any at-large positions on the governing body, fix the number, term and initial compensation of the governing body of the consolidated city-county and the method of election.

"(2) Determine whether elections of the governing body of the consolidated city-county shall be partisan or nonpartisan elections and the time at which such elections shall be held.

"(3) Determine the distribution of legislative and administrative duties of the consolidated city-county officials, provide for consolidation or expansion of services as necessary, authorize the appointment of a consolidated city-county administrator or a city-county manager, if deemed advisable, and prescribe the general structure of the consolidated city-county government.

"(4) Provide for the official name of the consolidated city-county.

"(5) Provide for the transfer or other disposition of property and other rights, claims and asserts of the county and city."

We are convinced that the legislature only delegated to the Commission the administrative power to draft a plan which was to be submitted to the voters of Wyandotte County for their approval or rejection. Most of our existing statutory law has been drafted by committees, and the statute books contain many laws that allow options to the voters to decide matters of public concern. Nothing can be more basic than to allow voters of a given area to decide the form of government they desire.

Justice Burch, in considering this issue, said in *State, ex rel., v. Hines,* 163 Kan. at 309: "Standards are difficult to define because of the variable nature thereof. They have been referred to as conditions, restrictions, limitations, yardsticks, guides, rules, *broad outlines* and similar synonymous expressions hereinafter set forth." (Emphasis added.)

Very few things, if any, in this world cannot be improved upon, and the Act before us fits in that category. The fact the Act can be improved does not make it unconstitutional. We hold that when read as a whole, the Act sets forth sufficient standards to allow the Commission to draft a plan the voters of Wyandotte County could adopt or reject.

*State, ex rel. [Dix] v. State Board of Education,* 215 Kan. 551, also supports this conclusion. In *Dix,* the legislature passed a statute which delegated the power to transfer state land to the State Board of Education (Board). Based on this statute, the Board en-

acted an order which transferred 56 sections of land from one unified school district to another. Shortly thereafter, the board members and residents of the transferee school district, which lost land in the transfer order, filed a petition, asking the court to enjoin the Board's order. The petition alleged that the transfer statute was an unconstitutional delegation of power. The district court agreed, holding that the transfer statute was unconstitutional and enjoining the land transfer.

Finding that a legislature could properly delegate power if certain conditions were met, the *Dix* court determined whether the statute at issue, which delegated the power to modify school districts to the Board, contained sufficiently clear standards to prescribe the manner in which the Board should exercise its delegated power. In searching for such standards, the court viewed not just the one statute at issue, but the entire school unification act within which the statute was originally enacted and the legislative purpose behind the act. As the court stated, "In order to ascertain the legislative intent courts should not consider one isolated part of an act but are required to consider and construe all parts thereof *in pari materia.*" 215 Kan. at 557. This court ruled that adequate guidelines to direct the Board on how to exercise its delegated power could be found in the School Unification Act.

Like the *Dix* case, the standards which the legislature provided in the Act herein were definite and sufficient so to guide the Commission in determining if consolidation should occur and, if so, how much information should be included in the Plan. Such standards defined the parameters of the Commission's discretion. It would have been both impractical and unnecessary for the legislature to have provided more detail in the Act when it delegated the power at issue to the Commission. Instead, the legislature directed the Commission, as an administrative agency, to utilize administrative power and "fill in the details" within the definite outline set forth in the Act. The Act is not an unconstitutional delegation of legislative power to an administrative agency. This issue fails.

## III. ART. 2, § 20 OF THE KANSAS CONSTITUTION

Art. 2, § 20 of the Kansas Constitution provides:

"**Enacting clause of bills; laws enacted only by bill.** The enacting clause of all bills shall be 'Be it enacted by the Legislature of the State of Kansas:' *No law shall be enacted except by bill.*" (Emphasis added.)

"Article 2, § 20, of the Kansas Constitution is a restriction upon the legislature's power to make a new law except in the manner prescribed." *State v. Kearns*, 229 Kan. 207, 209, 623 P.2d 507 (1981) (holding that the alteration of the enabling language required by art. 2, § 20 renders a statute unconstitutional and void; substantial compliance with the enabling language is not sufficient).

Upon the effective date of the Plan, several current statutory requirements were automatically modified, although such modification was not directly considered by the legislature. For instance, at the time that the Plan became effective, K.S.A. 19-301 provided that a county clerk shall be *elected* in each county. K.S.A. 19-501 provided that a county treasurer shall be *elected* in each county. K.S.A. 19-3a01 provided that there shall be *elected* in Wyandotte County a public administrator. K.S.A. 19-1401 provided that there shall be *elected* in Wyandotte County a county surveyor. All of these statutes had previously been enacted in response to a constitutional mandate which provides that the legislature "shall provide for such county and township officers as may be necessary." Kan. Const. art. 9, § 2.

However, once the Plan was approved by voters, it converted the Wyandotte County elective offices of county clerk, county treasurer, public administrator, and county surveyor to appointive positions in the Unified Government. This was done without formal amendment to the above-cited statutes. The relator takes issue with this change because the legislature had previously determined that these positions in Wyandotte County must be elective, not appointive, positions. The relator claims that such statutory amendments were blatantly unconstitutional because they were never directly considered by the legislature or approved by the Governor in the form of a bill.

Finally, the relator claims that citizens cannot know what laws apply to the Unified Government unless the legislature directly states which statutes apply to it. Such a direct statement can only

be done, the relator contends, by passing a legislative amendment to the current effective statutes which clarifies that these statutes no longer apply to the Unified Government. The relator contends that a proper amendment of the above statutes cannot be done by implication within the Plan, which simply imposes provisions on the Unified Government that are contrary to the above statutes. Rather, the relator argues, such a proper amendment can only be done by a bill enacted by the legislature. Thus, the relator asserts that the Act violates art. 2, § 20, which prohibits any law from being enacted except by bill, because the Plan attempts to amend statutes, by exempting the Unified Government from their application, without submitting such amendments in the form of a bill to the legislature.

The relator does not point to any inconsistency between the Plan and the statutes cited above that the Act did not specifically authorize. The Act, as a valid, properly enacted law, gave the voters of Wyandotte County the "local option" to adopt the Plan, which recommended a new form of consolidated government. The legislature had already approved the Plan, in the Act, by properly delegating the power to fill in the Plan's details to the Commission; by providing proper guidelines to the Commission about how to fill in the Plan's details (including some details which might be inconsistent with current statutes); and by allowing the voters to adopt the Plan as a local option if they chose.

The voters of Wyandotte County did not enact new law by adopting the Plan. Rather, they exercised the express authority given to them by the legislature and adopted a local option—the Plan. The legislature properly delegated the job of filling in the details of the Plan to the Commission. It provided the Commission with certain guidelines or factors that must be included in the Plan, should the Commission recommend consolidation. For instance, the legislature expressly provided in the Act that the Plan must authorize the appointment or elimination of elective offices. K.S.A. 1997 Supp. 12-344(b)(3). Thus, the legislature was aware of the fact that if the Wyandotte County voters adopted the Plan as a local option, with its details filled in by the Commission, then the Plan might eliminate some elective positions.

This is exactly what happened. The local option (the Plan) authorized the elimination of several elective offices. The Wyandotte County voters adopted the local option, and those offices enumerated in the Plan became appointive, as opposed to elective, offices. Such change conflicted with certain statutes, cited above, that had previously applied to Wyandotte County and mandated that the offices be elective. However, neither the Plan nor the voters of Wyandotte County implicitly amended these statutes. Rather, the voters simply exercised the authority specifically granted to them by the legislature, in the Act, to adopt a local option (the Plan), which authorized the elimination of several elective offices, as the Act specifically authorized the Plan to do. The legislature was fully aware that these changes might occur and approved of these changes by passing the Act, which authorized such changes.

The Plan did not first need to be submitted to the legislature in the form of a bill to be proper. The Act does not violate art. 2, § 20 of the Kansas Constitution for the failure to include such a provision.

The Act, which authorizes the proposal and adoption of local legislation without first requiring that the local legislation be presented to the legislature in the form of a bill, is similar to several other state laws which have authorized the adoption of "local options." For instance, K.S.A. 12-1001 *et seq.* authorizes cities to adopt a commissioner-city manager form of government if the voters approve it; K.S.A. 12-10a01 authorizes cities to adopt a modified mayor-council form of government if the voters approve it; K.S.A. 12-811 authorizes a city to acquire control of a franchise water, gas, or electric plant if the voters approve it; K.S.A. 13-1501 authorizes first class cities to adopt a commission form of government if the voters approve it; and K.S.A. 1997 Supp. 19-204(c) authorizes the board of county commissioners of any county, by resolution, to divide the county into three, five, or seven commissioner districts if the voters approve it.

The Act does not specifically repeal or amend any prior law. Thus, all prior laws still apply to the Unified Government, unless the prior laws conflict with the Act or the Plan. If such conflict

occurs, then the Plan's provisions, as authorized in the Act, prevail because the Act is the more specific, more recent statute.

When two statutes conflict, *i.e.*, one states a county treasurer must be elected and the other states that the Unified Government's treasurer is an appointive position, then the more specific, more recent statute controls. See *Jones v. Continental Can Co.*, 260 Kan. 547, 556, 920 P.2d 939 (1996) ("[O]lder statutes . . . are subordinate to new enactments . . ., as the newer statute is the later expression of the legislative intent and so will control if there is a possible conflict between the two.); *State v. Le*, 260 Kan. 845, Syl. ¶ 2, 926 P.2d 638 (1996) ("General and special statutes should be read together and harmonized whenever possible, but to the extent a conflict between them exists, the special statute will prevail unless it appears the legislature intended to make the general statute controlling."). The Act was enacted in 1996 and applies specifically to the Unified Government. All of the statutes cited by the relator, which were supposedly "amended" by the Plan, were enacted prior to 1996 and applied generally to all counties or to Wyandotte County. The Plan does not amend certain statutes by exempting the Unified Government from its application. Thus, the Plan did not need to be presented to the legislature or the Governor in the form of a bill. Instead, the Act and the Plan simply control over other conflicting statutes because the Act is a more recent, more specific statute. This is not unconstitutional. This issue fails.

## IV. CONCURRENT RESOLUTION

Art. 2, § 1 of the Kansas Constitution provides: "The legislative power of this state shall be vested in a house of representatives and senate." Art. 2, § 14(a) of the Kansas Constitution provides in pertinent part: "[E]very bill shall be signed by the presiding officers and presented to the governor."

K.S.A. 1997 Supp. 12-343(f) provides in pertinent part:

*"Unless the legislature, by concurrent resolution adopted on or before February 12, 1997, the 30th day of the 1997 regular session, rejects such plan*, the plan shall be submitted to the qualified electors of the county at the school district general election on April 1, 1997. Such election shall be called and held by the county election officer in the manner provided by the general bond law. A summary of the final plan shall be prepared by the commission and shall be published once

each week for two consecutive weeks in a newspaper of general circulation within the county. If a majority of the electors voting on the plan vote in favor thereof, the consolidation plan shall be implemented in the manner provided by the plan. If a majority of the electors vote against such plan, the proposed consolidation plan shall not be implemented." (Emphasis added.)

The relator claims that 12-343(f) violated art. 2, §§ 1 and 14 of the Kansas Constitution and the separation of powers doctrine because it allowed the legislature the right to reject or veto the Plan by a concurrent resolution. As such, the relator claims that 12-343(f) effectively allowed the legislature to change or repeal the local option law without having to present such change to the Governor for approval.

*State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 687 P.2d 622 (1984), discusses the use of a legislative veto. In *Stephan*, the Attorney General brought an action in mandamus and quo warranto against the legislature, seeking determination of the constitutionality of a statute, K.S.A. 1983 Supp. 77-426(c) and (d). This statute provided that the legislature may adopt, modify, or revoke administrative rules and regulations by concurrent resolutions passed by the legislature without presentment to the Governor. Pursuant to this statute, the legislature adopted concurrent resolutions during the 1983 and 1984 legislative sessions. The Attorney General brought a quo warranto case to test the validity of the statute and to test the validity of actions taken by the legislature pursuant to the statute. The Attorney General claimed that the statute violated that separation of powers doctrine because it allowed the legislature to usurp the executive power of administering and enforcing laws from the executive branch. Further, the Attorney General claimed that the statute violated art. 2, § 14 of the Kansas Constitution, which requires all bills to be presented to the Governor.

In analyzing this statute, the *Stephan* court focused mainly on whether the concurrent resolution mechanism violated the separation of powers doctrine. However, the court also discussed whether the mechanism violated the required procedure under art. 2, § 14(a), which requires all bills to be presented to the Governor. In making its decision, the *Stephan* court relied on three out-of-

state cases: *INS v. Chadha*, 462 U.S. 919, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983); *Consumer Energy, Etc. v. F.E.R.C.*, 673 F.2d 425 (D.C. Cir. 1982), *aff'd* 463 U.S. 1216, 77 L. Ed. 2d 1402, 103 S. Ct. 3556, *reh. denied* 463 U.S. 1250 (1983); *State v. A.L.I.V.E. Voluntary*, 606 P.2d 769 (Alaska 1980). Each of these cases will be discussed in turn.

In *Chadha*, the Court analyzed a federal act which allowed either house of Congress to veto, by resolution, a decision of the United States Attorney General to suspend an illegal alien's deportation. The I.N.S. had ruled that Chadha could remain in this country even though he was subject to deportation. Under the act at issue, the House of Representatives vetoed this decision, forcing the I.N.S. to issue an order of deportation. Chadha challenged the constitutionality of the act in federal court. The Supreme Court ruled that once the legislature properly delegated the power to the Attorney General in the executive branch to determine deportation issues, then Congress could not reverse the Attorney General's decision on such issues or reverse its own decision to delegate deportation issues to the Attorney General without bicameral passage of an act stating such reversal, followed by presentment of the act to the President. In other words, "Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." 462 U.S. at 955. The *Chadha* Court concluded that the legislative action to reverse the Attorney General's deportation decision or reverse its own delegation of deportation issues to the Attorney General was subject to the procedures set out in Art. I, § 7 of the United States Constitution. This section requires that all legislative actions be passed by a majority of both houses of Congress and be presented to the President. Since the federal act allowed the legislature to undertake legislative action without such procedure, the Supreme Court found the act unconstitutional as a violation of Art. I, § 7 and of the separation of powers doctrine. 462 U.S. at 955-59.

In *Consumer Energy, Etc.*, 673 F.2d 425, the Federal Court of Appeals analyzed a one-house legislative veto provision in the Natural Gas Policy Act of 1978. The legislative veto provision only allowed certain rulings of the Federal Energy Regulatory Com-

mission (F.E.R.C.) to become effective if neither house in Congress adopted a resolution disapproving of such rules within 30 days of the rules being presented to Congress. Using this provision, the House of Representatives adopted a resolution which disapproved of one of the F.E.R.C.'s rulings. The Act, with this provision, was challenged as a violation of the separation of powers doctrine and as a violation of Art. I, § 7 of the United States Constitution.

Upon evaluation, the United States Court of Appeals found that the one-house legislative veto mechanism violated Art. I, § 7 because it deprived the President of his veto power and because it did not follow the bicameral requirement in that it permitted legislative action by only one house of Congress. In other words, the court held the veto of the rules effectively changed the law by altering the scope of F.E.R.C.'s discretion and preventing one otherwise valid regulation from taking effect. Accordingly, the Senate's concurrence and presentation to the President were necessary prerequisites to the effectiveness of the disapproval resolution. 673 F.2d at 465. The federal court also ruled that the veto mechanism violated the separation of powers doctrine because it allowed the legislature to usurp powers already exercised and delegated to the other two branches of government. 673 F.2d at 471. As the federal court stated:

> "The fundamental problem of the one-house veto, then, is that it represents an attempt by Congress to retain direct control over delegated administrative power. Congress may provide detailed rules of conduct to be administered without discretion by administrative officers, or it may provide broad policy guidance and leave the details to be filled in by administrative officers exercising substantial discretion. It may not, however, insert one of its houses as an effective administrative decisionmaker." 673 F.2d at 476.

See also *Consumers Union of U.S., Inc. v. F.T.C.*, 691 F.2d 575 (D.C. Cir. 1982), *aff'd* 463 U.S. 1216, 77 L. Ed. 2d 1402, 103 S. Ct. 3556, *reh. denied* 463 U.S. 1250 (1983) (a similar legislative oversight mechanism contained in the Federal Trade Commission Improvements Act of 1980 was held to violate the separation of powers doctrine).

Finally, the *Stephan* court relied on *State v. A.L.I.V.E. Voluntary*, 606 P.2d 769. In that case, the Alaska court analyzed a statute

which allowed the legislature to reject a regulation of a state agency or department by adopting a concurrent resolution in both houses. However, the Alaska Constitution, like the Kansas Constitution, includes a section which requires a bill to be passed by a majority vote in each house of the legislature and presented to the Governor. The Alaska court held that the legislative veto·mechanism violated these constitutional requirements. 609 P.2d at 770. See also *General Assembly· of State of New Jersey v. Byrne*, 90 N. J. 376, 448 A.2d 438 (1982) (an act which allowed a legislature to veto, by concurrent resolution in both houses, all rules proposed by state agencies was found unconstitutional because it violated the separation of powers doctrine and the presentment requirement of the New Jersey Constitution).

Based on these cases, the *Stephan* court found that the legislative veto mechanism in K.S.A. 1983 Supp. 77-426(c) and (d) violated the separation of powers doctrine and the presentment requirement in art. 2, § 14 of the Kansas Constitution. As this court stated:

"As made clear by the court in *Chadha*, a resolution is essentially legislative where it affects the legal rights, duties and regulations of persons outside the legislative branch and therefore must comply with the enactment provisions of the constitution. 103 S. Ct. at 2784. See also *State v. A.L.I.V.E. Voluntary*, 606 P.2d at 773-74. Where our legislature attempts to reject, modify or revoke administrative rules and regulations by concurrent resolution it is enacting legislation which must comply with the provisions of art. 2, § 14. A bill does not become a law until it has the final consideration of the house, senate and governor as required by art. 2, § 14. *Harris v. Shanahan*, 192 Kan. 183, Syl. ¶ 1, 387 P.2d 771 (1963). This was not done here.

"The fact that K.S.A. 1983 Supp. 77-426 was passed in accordance with the provisions of art. 2, § 14 of our state constitution and the governor had the opportunity to veto it does not render subsequent acts of the legislature under the statute constitutional. The legislature cannot pass an act that allows it to violate the constitution. *General Assembly of State of New Jersey v. Byrne*, 90 N.J. at 391. As stated by the court in *State v. A.L.I.V.E. Voluntary*, 606 P.2d at 779:

'In other words, by virtue of one enactment approved by the governor, the legislature can free itself, in certain instances, of the constitutional constraints that would otherwise govern its actions. Such an enactment would impermissibly preserve legislative power possessed at one instant in time for future periods when the legislature might otherwise be incapable of acting because of the executive veto. It would also do away with the formal safeguards of article II which are

meant to accompany law-making. The requirements of the constitution may not be eliminated in this fashion.' " 236 Kan. at 64.

Under this analysis, the *Stephan* court held that K.S.A. 1983 Supp. 77-426(c) and (d) were unconstitutional and that the resolutions adopted by the legislature rejecting, adopting, and modifying certain administrative regulations pursuant to this statute were invalid.

In this case, the legislature properly delegated the power to fill in the details of the local option (the Plan) to the Commission. Once it does so, the legislature may not reserve the power to take back such delegation by concurrent resolution if it disagrees with the Commission's Plan. If the legislature wishes to take back this delegation, it must do so by passing a statute which removes such delegation and present this statute to the Governor. It cannot do so simply by reserving the power to remove the delegation in the same act which delegates the power to the Commission. This is improper. See *Stephan*, 236 Kan. at 60 ("Once the legislature has delegated by a law a function to the executive, it may only revoke that authority by proper enactment of another law in accordance with the provisions of art. 2, § 14 of our state constitution.").

However, this issue concerning the legislature's reserved right to reject the Plan is, in fact, irrelevant because the legislature did not exercise this right. The legislature neither exercised nor attempted to exercise its reserved right to reject the Plan by concurrent resolution, nor did the Governor suggest the Plan be rejected, and the time to exercise that right has expired. K.S.A. 1997 Supp. 12-343(f) (allowing 30 days for the legislature to reject the Plan); see *Randall v. Seemann*, 228 Kan. 395, 613 P.2d 1376 (1980) (issue is meaningless after its relevance has passed).

In addition, K.S.A. 1997 Supp. 12-343(f) can be severed from the rest of the Act so that the entire Act and the resulting Plan does not need to be struck down. Where parts of a statute or a section of a statute can be readily separated, then the part which is constitutional may stand while the unconstitutional part is rejected. *Voran v. Wright*, 129 Kan. 601, Syl. ¶ 6, 284 Pac. 807 (1930). As *Sedlak v. Dick*, 256 Kan. 779, 803, 887 P.2d 1119 (1995), provides:

"In *Thompson v. K.F.B. Ins. Co.*, 252 Kan. 1010, 1023, 850 P.2d 773 (1993), we stated the test to be applied:

" 'Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent.' " (Quoting *Felton Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 [1958].)

In this case, K.S.A. 1997 Supp. 12-343(f), which reserved the right of the legislature to reject the Plan by concurrent resolution, is a discrete provision of the Act that can be severed from the Act without doing violence to the basic statutory scheme. See *State, ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, Syl. ¶ 2, 343 P.2d 234 (1959). Since the improper legislative veto is irrelevant because it was never exercised and is severable from the rest of the Act, this issue fails.

## V. K.S.A. 1997 SUPP. 12-343(f)

Art. 2, § 1 of the Kansas Constitution provides: "The legislative power of this state shall be vested in a house of representatives and senate." This provision "expresses the fundamental concept that we are to be governed by our duly elected representatives. It is the foundation upon which our democratic form of government is built." *Sedlak v. Dick*, 256 Kan. at 802. This provision establishes a republican form of government, which constitutes a government by the people through representatives approved by them. 16A Am. Jur. 2d, Constitutional Law § 626. The relator argues that by selecting a republican form of government, the citizens of Kansas delegated their legislative rights to the legislature and only retained the right to elect such officials and amend the constitution. See art. 14, § 1 of the Kansas Constitution. According to the relator, the legislature may not delegate to the voters its legislative power to decide if a law will become effective. If the legislature does so and the existence of the law depends upon the vote of the people, then,

the relator asserts, the law is an unconstitutional delegation of legislative power to the people, in violation of a republican form of government (art. 2, § 1). See *Opinion of the Justices*, 287 Ala. 321, 324, 251 So. 2d 739 (1971); *Gannett v. Cook*, 245 Iowa 750, 61 N.W.2d 703 (1953); *Wright v. Cunningham*, 115 Tenn. 445, 91 S.W. 293 (1905).

K.S.A. 1997 Supp. 12-343(f) provides that the Plan shall be submitted to a vote of the citizens of Wyandotte County. This section provides in pertinent part:

"Unless the legislature, by concurrent resolution adopted on or before February 12, 1997, the 30th day of the 1997 regular session, rejects such plan, *the plan shall be submitted to the qualified electors of the county* at the school district general election on April 1, 1997. Such election shall be called and held by the county election officer in the manner provided by the general bond law. A summary of the final plan shall be prepared by the commission and shall be published once each week for two consecutive weeks in a newspaper of general circulation within the county. *If a majority of the electors voting on the plan vote in favor thereof, the consolidation plan shall be implemented in the manner provided by the plan. If a majority of the electors vote against such plan, the proposed consolidation plan shall not be implemented.*" (Emphasis added.)

Claiming that the existence and effectiveness of the Plan depended upon the vote of the electorate in Wyandotte County, the relator argues that the legislature unconstitutionally delegated its legislative power—the power to decide if a law will be effective—to the voters of Wyandotte County and unconstitutionally destroyed the State's republican form of government. Thus, the relator asks this court to strike down the Act, the Plan, and the new form of government as an unconstitutional violation of art. 2, § 1 of the Kansas Constitution.

In *State, ex rel., v. Lamont*, 105 Kan. 134, 138, 181 Pac. 617 (1919), involving the right of electors to determine whether they would organize a school district, it was said:

"So it may be said here that the will of the petitioners does not govern, but when the provision made by the legislature is accepted by the electors themselves by the proper vote, it becomes operative. The legislature gives them permission to form themselves into such district, and when, by the proper election, they avail themselves of this permission, they are *not exercising legislative power, but merely accepting a privilege conferred by a proper exercise of such power.* Such granted

permission is one means by which the legislature has seen fit to obey the constitutional mandate to promote education, and such provision is not a violation of the constitution."

See *Barrett v. City of Osawatomie*, 131 Kan. 50, 53, 289 Pac. 970 (1930).

"*We believe it untenable to hold a law which permits the question of attachment of territory to be decided finally by the popular vote of the electors within the territory seeking attachment is a delegation of legislative power.* We are satisfied section 41 of the instant act does not violate article 2, section 1, of our constitution. Moreover, if courts entertain any doubt on that subject it is always resolved in favor of validity. Statutes are not stricken down unless the infringement of the superior law is clear beyond reasonable doubt. (*Hunt v. Eddy*, 150 Kan. 1, 90 P.2d 747.)" *State, ex rel., v. Board of Education*, 173 Kan. 780, 790, 252 P.2d 859 (1953).

The existence of the Act was not dependent upon the approval of the electorate in Wyandotte County. The Act was a valid local option law complete in and of itself when it was passed by the legislature and was signed by the Governor. At that time, it became effective in that it delegated power to the Commission to fill in the details of the local option (the Plan). See *Gannett v. Cook*, 245 Iowa at 760-62. *Cf. Wright v. Cunningham*, 115 Tenn. at 466-67. The will of the electorate did not enact the Plan, either. Rather, the legislature enacted a valid law (the Act, which included the Plan) and when the electors accepted the local option offered in the Act (the Plan) by a popular vote, the Plan became applicable to them. In so doing, the voters did not exercise legislative power by enacting a general law; instead, the voters who were most affected by the legislation merely accepted a privilege to consolidate which was conferred in the Act. *State, ex rel., [Gray] v. Board of Education*, 173 Kan. at 789-90; see *Gannett v. Cook*, 245 Iowa at 760-62; *Akin v. Director of Revenue*, 934 S.W.2d 295, 299 (Mo. 1996).

The voters' approval of the Plan was not necessary for the Act, which included the Plan, to be an effective local option law offering a local option (the Plan) to Wyandotte County and Kansas City, Kansas. The voters' approval was only necessary to apply this local option to Wyandotte County and Kansas City, Kansas. The Act was

still a valid law enacted by the legislature, and not the voters, even if its application was made to depend on some subsequent event—the approval of the Wyandotte County electorate. *State v. Butler County*, 77 Kan. 527, 530, 94 Pac. 1004 (1908); *Akin v. Director of Revenue*, 934 S.W.2d at 299. *Cf. Wright v. Cunningham*, 115 Tenn. at 467-68. The Act was a law of a local option nature, where it was complete law but was to become applicable upon an election by the electorate. See *Gannett v. Cook*, 245 Iowa at 760-62.

The Act simply gave the voters in Wyandotte County the opportunity to vote on a "local option" (the Plan) which would apply to them if they wanted it to. See *Gannett v. Cook*, 245 Iowa at 760-62. The Act did not compel electors to accept consolidation but gave them the choice of consolidation. However, the Act did not leave this decision completely up to the electors. Before the electors were ever given such choice, the legislature required the Commission to study consolidation, decide whether it was in the public interest, and if so, create a Plan to implement it, giving the electorate the opportunity to finally approve it. *State, ex rel., v. Board of Education*, 173 Kan. at 789-90; *State ex rel. v. Drainage District*, 123 Kan. 191, 192-95, 254 Pac. 371 (1927); *State, ex rel., v. Lamont*, 105 Kan. at 138; *State v. Butler County*, 77 Kan. at 530.

Further, the Act did not give individual persons the power to decide if consolidation should occur. Rather, the Act allowed for the consolidation of Wyandotte County and Kansas City, Kansas, if the electors in these areas, as a whole, approved it. See *State, ex rel., v. Lamont*, 105 Kan. at 138; *Hill v. Johnson County*, 82 Kan. 813, 109 Pac. 163 (1910); *cf. Hutchinson v. Leimbach*, 68 Kan. 37, 74 Pac. 598 (1903); *Comm'rs of Wyandotte Co. v. Abbott*, 52 Kan. 148, 34 Pac. 416 (1893).

We hold that neither the Act nor the Plan constituted an improper delegation of legislative power—the power to make a law effective—to the voters. As such, neither the Act nor the Plan violated art. 2, § 1 or destroyed the republican form of government in Kansas. This issue fails.

### VI. ART. 2, § 17 OF THE KANSAS CONSTITUTION

Art. 2, § 17 states:

"**Uniform operation of laws of a general nature**. All laws of a general nature shall have a uniform operation throughout the state: *Provided,* The legislature may designate areas in counties that have become urban in character as 'urban areas' and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper."

K.S.A. 1997 Supp. 12-345(b) provides:

"Wyandotte county is hereby designated an urban area, as authorized under the provisions of section 17 of article 2 of the constitution of the state of Kansas, for the purpose of granting to such county and urban area powers of local government and consolidation of local government."

The Act is a law of a general nature which does not have a uniform operation throughout the state. Thus, the legislature enacted 12-345(b), declaring Wyandotte County to be an urban area, in order to make the Act fit within the proviso of art. 2, § 17, and avoid its prohibition against nonuniform operation of laws of a general nature. However, the relator argues that the proviso in art. 2, § 17 does not apply to the Act for the following three reasons. First, under art. 2, § 17, the legislature may designate areas *in counties* as urban areas. In the Act, however, the legislature designated *all* of Wyandotte County as an urban area, rather than designating an area *in* the county as an urban area. Since the urban area proviso does not apply to the Act, the relator asserts that this Act is improper under art. 2, § 17 because it is a law of general nature which does not have a uniform operation throughout the state.

This argument makes no sense. It is unreasonable to read the art. 2, § 17 proviso as applying only to areas in counties designated as urban areas and not to entire counties designated as urban areas. Under the relator's interpretation of the proviso, the legislature could have designated two or more areas in Wyandotte County as urban areas, even if these areas comprised the entire area of the county, and the proviso of art. 2, § 17, allowing special legislation for these urban areas, would have applied. Thus, the legislature's delegation of the entire area of Wyandotte County as an urban area did fall within the proviso and did allow for special legislation. See K.S.A. 19-2654; K.S.A. 19-2883; K.S.A. 19-3524; K.S.A. 19-2681.

Further, the relator claims that the urban area proviso does not apply to the Act for a second reason. Under art. 2, § 17, once the legislature has designated an area in a county as an "urban area," then it may properly enact special laws to grant the urban area the powers of local government. According to the relator, such grant of power is intended to give urban areas in a county the ability to exercise the power of local government. With this power, as authorized by art. 2, § 17, the legislature allows an "urban area" in a county to administer local governmental power, just as if it were an incorporated city, because it is "urban" in character. However, the relator claims that there was no need for the legislature to enact a special law granting the "urban area" at issue—Wyandotte County—the power of local government. This is because the entirety of the county (but for 2.7 square miles) is made up of cities. These cities, including the City, already exercised the powers of local government pursuant to their charters and the Kansas Constitution. There was no need to grant the City, or any of the other cities making up the county, the powers of local government in special legislation, such as the Act, because they already had such powers. Thus, even though the legislature designated Wyandotte County as an urban area, the relator asserts that the legislature's enactment of a special law (the Act) to grant Wyandotte County the power of local government was improper because the County did not need these powers of local government as an urban area. This argument fails. The legislature has never been required to have a need for a law before adopting a law.

Finally, the relator points out that under art. 2, § 17, once the legislature has delegated an area in a county as an "urban area," then it may properly enact special laws to grant one or more such counties or urban areas the powers of local government and *consolidation of local government*. According to the relator, this constitutional provision is intended to permit the legislature, in a special law, to give two counties or two designated urban areas within a county the power of local government and the power to consolidate their local governments. However, the relator claims that the art. 2, § 17 proviso does not authorize the legislature to enact a special law which provides for the consolidation of a county or

urban area and a *city*, which already has the power of local government independent of art. 2, § 17. According to the relator, the legislature is attempting to allow consolidation of Wyandotte County and Kansas City by a special law, which is improper under art. 2, § 17, because it requires all laws of a general nature to have a uniform operation throughout the state.

In addressing this argument by the relator, the question is whether the proviso creates an exemption from the uniformity requirement for special legislation which grants the power for local government consolidation of an urban area/county and a city, or only creates an exemption for legislation which grants the power for local government consolidation of two urban area/counties. This is a tough question because neither the language of the proviso nor the cases analyzing it give any real clue as to the purpose of the proviso regarding this issue.

However, statutes are to be presumed constitutional. Further, the constitution only prohibits improper legislation; it does not authorize. Unless the constitution specifically prohibits legislation, it is allowed. In art. 2, § 17, the proviso does not specifically state that it only applies to special legislation which grants the power of local government consolidation to two urban area/counties, as opposed to one urban area/county and one city. The purpose of allowing special legislation that grants the power to consolidate is to prevent duplicative services and functions by more than one local government. This purpose is served whether the local governments of two urban areas are consolidated or the local governments of one urban area and one city are consolidated. Thus, we hold that the proviso creates an exemption from the uniformity requirement for special legislation which grants the power for local government consolidation of an urban area/county and a city.

Also, the relator contends that the Act is inconsistent with the restrictions imposed on county consolidation in K.S.A. 1997 Supp. 19-101a(a)(2). This statute lists limitations, restrictions, and prohibitions on county home rule powers, providing in pertinent part: "The board of county commissioners may transact all county business and perform all powers of local legislation and administration it deems appropriate, subject only to the following limitations, re-

strictions, or prohibitions: . . . (2) *Counties may not consolidate* or alter county boundaries." (Emphasis added.)

Obviously, the legislature, in adopting the above statutes and the county home rule statute, K.S.A. 1997 Supp. 19-101a(a)(2), which prohibits counties from consolidating, thought there was no constitutional prohibition on the consolidation of counties. After all, a statute prohibiting county consolidation would be unnecessary if the constitution already prohibited such consolidation. We hold the statute only applies to counties consolidating with one another and does not apply to a county consolidating with a city, as authorized in the Act. In any event, the legislature was free to adopt subsequent special legislation permitting a city and county to consolidate, and such statute would control over K.S.A. 1997 Supp. 19-101a(a)(2). Neither the Kansas Constitution (art. 2, § 17) nor the statute (K.S.A. 1997 Supp. 19-101a[a][2]) prohibits the legislature from enacting special legislation (the Act), which allows for the consolidation of Wyandotte County, as an urban area, and Kansas City, Kansas.

In conclusion, we hold that the art. 2, § 17 proviso applies to the Act because the Act is special law which gives to one urban area the power to consolidate its local government with a city's local government, as the legislature deemed proper. Since the proviso applies to the Act, the proviso exempts the Act from the uniformity requirement in art. 2, § 17. Thus, even though the Act is a law of a general nature that does not have a geographically uniform operation throughout the state, the Act is not prohibited by art. 2, § 17, because the proviso applies to the Act and exempts the Act from the uniformity requirement in art. 2, § 17. This issue fails.

This conclusion is supported in an article by Barkley Clark regarding the "urban areas" proviso in art. 2, § 17. Clark states:

"Few states have anything quite like it. The 1954 amendment should be a signal to the Kansas Supreme Court to use its powers of judicial review with great caution when dealing with any enactment affecting a designated 'urban area.' If the legislature has made the appropriate recitals in an 'urban area' bill, the court should usually defer to the legislative findings . . . In any case, though it has not yet been construed, the 1954 amendment can provide flexibility for the legislature in handling metropolitan-area problems in Kansas." Clark, *State Control of Local*

*Government in Kansas: Special Legislation and Home Rule,* 20 Kan. L. Rev. 631, 646 (1972).

## VII. ART. 12, § 5 OF THE KANSAS CONSTITUTION

Art. 12, § 5 is the constitutional provision granting cities home rule power. This section provides in pertinent part:

"(a) The legislature shall provide by *general law, applicable to all cities, for the incorporation of cities and the methods by which city boundaries may be altered, cities may be merged or consolidated and cities may be dissolved* . . . ." (Emphasis added.)

Under this provision, in order for a city to merge, *consolidate,* or dissolve, the legislature must enact a general law "applicable to all cities." However, the Act herein is not a general law applicable to all cities, but is a law narrowly confined to the City and the County. Since the Act, which authorized the consolidation of a city, only applied to the City and the County, and did not apply uniformly to all cities, the relator claims that the Act unconstitutionally violates art. 12, § 5(a).

Art. 12, § 5 was completely amended in 1959, effective July 1, 1961. When the constitutional provision was originally adopted in 1861, it succinctly stated: "Provision shall be made by general law for the organization of cities, towns and villages; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power." However, in 1960, the voters' adoption of an amendment to art. 12, § 5 completely changed the provision. The amendment included the power of home rule for cities and the "general law" language, at issue herein, regarding the incorporation of cities (art. 12, § 5[a]).

In 1962, Albert Martin, then General Attorney and Director of Research for the League of Kansas Municipalities, wrote an article about the new art. 12, § 5(a) and made this observation about its "general law" requirements:

"In a way, all of these [laws which must be general laws under art. 12, § 5(a)] have to do with boundaries—by incorporation the original boundary is established (and the area given municipal life); by annexation the boundary is increased; by exclusion the boundary is reduced; by merger or consolidation the boundary is

increased; by dissolution the boundary disappears and municipal death occurs." Martin, *Home Rule for Kansas Cities*, 10 Kan. L. Rev. 501, 501-02 (1962).

In his 1965 treatise on home rule, James Drury explained the origins of art. 12, § 5(a). He stated that the request to reserve the powers of municipal expansion and consolidation to the legislature in art. 12, § 5(a) came from smaller cities, which were concerned that nearby large cities would rely on home rule to expand to absorb the smaller city's territory. Drury, *Home Rule in Kansas*, Governmental Res. Series No. 31 (1965), p. 48. Thus, art. 12, § 5(a) was adopted to help prevent big cities from consolidating with and taking over *other cities*, by requiring all such laws allowing consolidation of cities to be of a general nature, applicable to all cities, and not special legislation applicable only to certain (big) cities.

Here, the Act does not concern the consolidation of cities. Instead, it concerns the consolidation of a big city with a county that is almost its same size. In fact, the Act contains safeguards to prevent the takeover of nearby smaller cities by the City. As K.S.A. 1997 Supp. 12-345 provides in pertinent part:

"(h) Upon the effective date of the consolidation of the city and the county, the territory of the consolidated city-county shall include:

(1) All of the territory of the county for purposes of exercising the powers, duties and functions of a county.

(2) All of the territory of the county, *except* the territory of the cities of Bonner Springs, Edwardsville, Lake Quivira and the unincorporated area of the county, for purposes of exercising the powers, duties and functions of a city.

. . . .

"(j) Except for the consolidated city-county and unless otherwise provided by law, *other political subdivisions of the county shall not be affected* by consolidation of the city and county. Such other political subdivisions shall continue in existence and operation." (Emphasis added.)

Thus, the territory of the municipal governments of Bonner Springs, Edwardsville, and Lake Quivira are protected by the Act because the Act does not provide for the consolidation of the City with *another city*. It only allows the City to consolidate with the County. Thus, the concerns which art. 12, § 5 was intended to protect against, the takeover of a little city by a big city through consolidation, is not implicated in the Act. We hold that art. 12, § 5(a) only applies to statutes which authorize the consolidation of

two cities and does not apply to statutes which authorize the consolidation of a city and county, as the Act does. Thus, the Act is not prohibited by art. 12, § 5(a), even though it is not a general law which is applicable to all cities. This issue fails.

## VIII. ART. 12, § 5(C)(4) OF THE KANSAS CONSTITUTION

Up until the consolidation at issue, as authorized in the Act, the City operated under Charter Ordinance No. 84, which it adopted pursuant to the home rule authority granted to cities in art. 12, § 5(c)(1) of the Kansas Constitution. Charter Ordinance No. 84 was amended by Charter Ordinance No. 90 in 1983. Art. 12, § 5(c)(4) sets out a rule regarding charter ordinances, which provides:

"Each *charter ordinance* enacted *shall control* and prevail over any prior or subsequent act of the governing body of the city and *may be repealed or amended only by charter ordinance or by enactments of the legislature applicable to all cities.*" (Emphasis added.)

Under this constitutional provision, the legislature could not repeal or amend Charter Ordinances Nos. 84 and 90, which the City operated under, except by a legislative enactment which was applicable to all cities. According to the relator, the Act changed the City's form of government, which existed pursuant to Charter Ordinances Nos. 84 and 90; thus, the Act constituted an attempt to repeal these charter ordinances. However, as the relator points out, the Act was not a legislative enactment applicable to all cities; instead, it only applied to the City and the County. As such, the relator claims that the legislature violated art. 12, § 5(c)(4) by attempting to repeal Charter Ordinances Nos. 84 and 90 in an Act that was not applicable to all cities. Since the special Act could not constitutionally repeal the charter ordinances or change the city's government, the relator claims that the April 1997 election, in which the voters adopted the local option Plan to change their form of government, was a nullity.

After the elections were held, the city tried to comply with art. 12, § 5(c)(4) by adopting Charter Ordinance No. 114 on August 14, 1997, and publishing it on August 17, 1997. Charter Ordinance No. 114 repealed and amended certain sections of Charter Ordi-

nances Nos. 84 and 90. First, the relator claims, Charter Ordinance No. 114 selectively amended and repealed some of the governmental charter sections but left the remainder of Charter Ordinances Nos. 84 and 90 in place, thereby leaving the City's prior form of government in place.

Second, even if Charter Ordinance No. 114 was validly enacted, the relator claims that it is defective because it was not properly implemented. According to art. 12, § 5(c)(3), once a charter ordinance has been adopted, it cannot be effective for 61 days in order to give electors the opportunity to petition for a referendum on the charter. Under this rule, the relator points out that Charter Ordinance No. 114 was not effective until October 24, 1997, 60 days after its final publication on August 24, 1997 (first publication was August 17, 1997). However, the Commission held a local option election on April 1, 1997. A primary election to elect Unified Government officers was held on July 8, 1997, and a general election to elect Unified Government officers was held on September 9, 1997. The new Unified Government officers were sworn in on October 1, 1997. They adopted two resolutions on October 2, 1997, approving the Plan as the Charter of the Unified Government and establishing rules of procedure—all before the effective date (October 24, 1997) of Charter Ordinance No. 114, which repealed the prior charter ordinances setting out the city's prior form of local government. According to the relator, the Unified Government officers had no authority to take office on October 1 or to adopt resolutions setting up the government on October 2 because the City's old form of government was not repealed until the charter ordinance repealing it, as required by art. 12, § 5(c)(4), became effective on October 24, 1997, pursuant to art. 12, § 5(c).

In summary, the relator asserts that the Unified Government is an unlawful government which has taken office, passed unlawful law, entered into voidable contracts, and convicted persons in court without proper authorization. According to the relator, the Act authorizing the Unified Government violated numerous provisions of the Kansas Constitution; thus, the Unified Government must be declared void.

The Act requires the Commission to specify the effective date of consolidation within the Plan, should the Commission recommend consolidation. K.S.A. 1997 Supp. 12-344(b)(4). In the Plan, the Commission recommended consolidation and set the effective date of consolidation as the date on which the Unified Government officers were sworn in. ("Transfer of Authority: upon swearing in new consolidated government will assume existing authority of City ordinances and County resolutions.") The newly elected officials of the Unified Government were sworn in on October 1, 1997. Thus, the effective date of consolidation occurred on this date.

The electorate of the County voted on and adopted the Plan on April 1, 1997. Consolidation of the two governments did not occur immediately upon the voters' approval of the Plan. This is because consolidation was not effective until October 1, 1997, according to the Plan. As such, the voters' approval of the Plan did not constitute a repeal of the City's prior form of local government as set out in Charter Ordinances Nos. 84 and 90. If it had, then the City would have had no form of government at all from the time of the vote on April 1, 1997, until consolidation became effective on October 1, 1997. Instead, the voters' approval of the Plan constituted the voters' adoption of a local option to consolidate, as offered in the local option law (the Act). The voters did not create a new consolidated form of government at the precise time of the election, but approved the implementation of the consolidation process which would become effective on October 1, 1997, the date the new officers were sworn in. Thus, the vote did not constitute a repeal of the City's prior form of local government, as set out in Charter Ordinances Nos. 84 and 90, without utilizing another charter ordinance or a piece of legislation applicable to all cities. As such, the vote, and the Act which authorized the vote, did not violate art. 12, § 5(c)(4).

Under art. 12, § 5(c)(4), Charter Ordinances Nos. 84 and 90, setting out the City's prior form of government, could only be repealed by another charter ordinance or legislation applicable to all cities. Since the Act only applied to the City and the County, legislation applicable to all cities did not exist herein. However, before consolidation became effective, the City did try to repeal Charter

Ordinances Nos. 84 and 90 by adopting another charter ordinance—No. 114. Charter Ordinance No. 114 specifically repealed all sections of Charter Ordinances Nos. 84 and 90 concerning the City's prior form of local government that were inconsistent with the Plan and it replaced those sections with the Plan. The City's attempt through Charter Ordinance No. 114 to repeal only certain sections of Nos. 84 and 90, the sections that related to the City's prior form of local government, was proper. See *Edgington v. City of Overland Park*, 15 Kan. App. 2d 721, 728, 815 P.2d 1116 (1991) (approving a charter ordinance which repealed only one section of a previous charter ordinance).

However, under art. 12, § 5(c)(3), Charter Ordinance No. 114 could not take effect until 60 days after its first publication in order to give citizens time to compile a petition for a referendum on the ordinance. See *Edgington v. City of Overland Park*, 15 Kan. App. 2d at 728 ("It is, however, entirely reasonable to require that a charter ordinance be amended only by another charter ordinance, in order to preserve the super majority and referendum period requirements."). The City adopted Charter Ordinance No. 114 on August 4, 1997, and published it on August 17, 1997. Thus, Charter Ordinance No. 114 and its repeal of Charter Ordinances Nos. 84 and 90, which set out the City's prior form of local government, did not become effective until October 24, 1997. This date was 23 days after the consolidated government supposedly became effective under the Plan on October 1, 1997. Thus, for 23 days, the City apparently had two forms of local government effective at one time. The question is whether this dilemma permanently destroyed the validity of the consolidated government under art. 12, § 5(c)(4), which provides that Charter Ordinances Nos. 84 and 90 prevail over subsequent acts of the governing body (swearing in of Unified Government officers and making the Unified Government effective) unless Charter Ordinances Nos. 84 and 90 are repealed or amended by another charter ordinance (No. 114).

Statutes are to be presumed constitutional if at all possible. *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997). Once Charter Ordinance No. 114 became effective and repealed the local gov-

ernment sections in Charter Ordinances Nos. 84 and 90, then the City's prior local government, set out in these two charter ordinances, no longer governed the City. Thus, on October 24, 1997, the date Charter Ordinance No. 114 became effective and amended Charter Ordinances Nos. 84 and 90, the Unified Government became effective regarding the local government of the City.

The Unified Government has validly governed the County since October 1, 1997, the day the officers were sworn in. Charter Ordinances Nos. 84 and 90 only applied to the City, and their late amendment date by Charter Ordinance No. 114 did not affect the County or its governance by the Unified Government. Thus, the Unified Government validly adopted Resolution R-1-97, which approved the Plan as a charter for the Unified Government, as to the County. Further, the Unified Government validly adopted Resolution R-2-97, which approved certain rules of procedure, as to the County. These resolutions, which were adopted during the 23-day time period at issue, were not void upon enactment because they were adopted by an ineffective form of government. Instead, they were validly adopted by the County's valid and effective form of government—the Unified Government.

Of course, these resolutions did not apply to the City at this time since the City's prior form of local government still governed the City. However, when the Unified Government did become effective as to the City, approximately 20 days later, these resolutions, which the Unified Government validly adopted as to the County, also applied to the City at this time. From the record before the court, the Unified Government did not adopt any ordinances while acting solely as the City during this 23-day time period. All the resolutions the Unified Government adopted during the 23-day time period at issue properly applied to the County. Thus, since these resolutions were not null and void on the date of enactment, they became applicable to the City once the Unified Government became the City's form of local government on October 24, 1997.

In summary, the Unified Government was not effective as to the City until Charter Ordinances Nos. 84 and 90, which set out the City's prior form of local government, were properly amended as

to the local government sections by Charter Ordinance No. 114. Thus, the Unified Government, the Act and Plan authorizing its consolidation, and the acts it took as a County during this "ineffective" time period are not prohibited by art. 12, § 5(c)(4), which requires all charter ordinances to prevail over subsequent actions by a city until repealed or amended by another charter ordinance. This issue fails.

## IX. K.S.A. 12-3004 AND ART. 2, § 16 OF THE KANSAS CONSTITUTION

The Act required the Commission to set out a date in the Plan on which the consolidated government would become effective. K.S.A. 1997 Supp. 12-344(b)(4). The Plan stated that the consolidated government would become effective on the date the new Unified Government officers were sworn in. (Upon swearing in, new consolidated government will assume existing authority of City ordinances and County resolutions.) The Plan also stated that "[i]mmediately upon swearing-in of the Unified Board of Commissioners and the County Chief Executive/Mayor, all authority inherent in existing County Resolutions and City Ordinances will transfer to the Unified Government." The Unified Government officers were sworn in on October 1, 1997.

The first meeting of the Executive/Mayor and Unified Board of Commissioners of the Unified Government was held on October 2, 1997. At this meeting, the Unified Government officers adopted Resolution R-1-97, which approved the Plan as the general charter of the Unified Government. The primary purpose of Resolution R-1-97 was to codify the structural framework of the Plan. This Resolution provided that the Unified Government Commission may "*exercise its legislative authority either* by ordinance, resolution, charter ordinance or charter resolution in the manner prescribed in the existing laws of the State of Kansas, *the charter ordinances of the former City Council of Kansas City, Kansas*, the Charter, or as hereinafter prescribed by the Unified Government Commission." (Emphasis added.) Resolution R-1-97 also contained a provision vesting the Unified Government with "*any and all powers possessed* by the County of Wyandotte or the *City of Kansas City*

*immediately prior to the effective* date of *consolidation* of the two governments on October 1, 1997." (Emphasis added.) Finally, and most importantly, in § 6.01, Resolution R-1-97 stated:

"All charter ordinances, ordinances, or resolutions adopted by the City Council of the City of Kansas City, Kansas, shall continue in full force and effect, unless inconsistent with the provisions of the Charter, and shall have the legal effect of ordinances of the Unified Government until repealed, modified or amended by action of the Unified Government. All charter resolutions, and resolutions of Wyandotte County, Kansas, and regulations pertaining to said county, unless inconsistent with the provisions of the Charter, shall continue in force and effect and shall have the legal effect of ordinances of the Unified Government until repealed, modified or amended by subsequent action of the Unified Government including ordinances and resolutions existing or pending on or before October 1, 1997." (Emphasis added.)

The relator points to art. 2, § 16 of the Kansas Constitution, which provides:

"**Subject and title of bills; amendment or revival of statutes.** *No bill shall contain more than one subject*, except appropriation bills and bills for revision or codification of statutes. The subject of each bill shall be expressed in its title. No law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed. *The provisions of this section shall be liberally construed to effectuate the acts of the legislature.*" (Emphasis added.)

Further, the relator cites to K.S.A. 12-3004, which provides:

"*No ordinance shall contain more than one subject*, which shall be clearly expressed in its title; and no section or sections of an ordinance shall be amended unless the amending ordinance contains the entire section or sections as amended and the section or sections amended shall be repealed." (Emphasis added.)

The relator claims that the Unified Government's attempt to adopt all of the former City ordinances and County resolutions as laws of the Unified Government in one sweeping resolution violates K.S.A. 12-3004 and art. 2, § 16. According to the relator, Resolution R-1-97 violated the "one subject" rule as required by K.S.A. 12-3004 and art. 2, § 16 because it included a different subject for each and every City ordinance and County resolution it adopted. Further, the relator points out that the Unified Government did not even utilize an ordinance to adopt hundreds of

City ordinances and County resolutions, but attempted to do so in one small paragraph of a resolution.

Finally, the relator asserts that in adopting all of the City's previously existing ordinances, except for those that were inconsistent with the Unified Government's Charter, the Unified Government violated one of the basic tenets of legislation—notice to the public affected by the laws. As the relator points out, Resolution R-1-97 fails to specifically identify which of the City ordinances and County resolutions it is adopting and which ones are repealed because they were inconsistent with the Unified Government's Charter.

Art. 2, § 16 and its requirement that bills cannot contain more than one subject does not apply to city ordinances. *Garten Enterprises, Inc. v. City of Kansas City*, 219 Kan. 620, 549 P.2d 864 (1976) (citing *Topeka v. Raynor*, 61 Kan. 10, 58 Pac. 557 [1899]). Since it does not apply to city ordinances, it does not apply to county resolutions either. Thus, art. 2, § 16 and its one subject rule does not apply to § 6.01 in Resolution R-1-97 because this is a city/county resolution. However, K.S.A. 12-3004 and its one subject rule does apply to city/county ordinances and resolutions, including R-1-97. However, we find that § 6.01 of R-1-97 does not violate the one subject rule in K.S.A. 12-3004.

The subject of § 6.01 addresses the effect of the new consolidated government on previously existing ordinances and resolutions in the City and the County. Section 6.01 explains that the new consolidated government will have no effect on those ordinances and resolutions, unless they conflict with the Charter. This constitutes only one subject at issue in § 6.01. Section 6.01 is not adopting all of the City's prior ordinances and the County's prior resolutions. It does not need to do this because, as explained in § 6.01, these ordinances and resolutions were never repealed. Instead, in § 6.01 the consolidated government preserved the effectiveness of these ordinances and resolutions. Thus, § 6.01 does not deal with multiple subjects by adopting each different prior city and county ordinance and resolution. Instead, it deals with the one subject of how the new government affects prior law—it preserves all nonconflicting law.

Further, § 6.01 did not repeal all of the City's prior ordinances and the County's prior resolutions which were inconsistent with the Charter. The Charter would automatically control over them, should a conflict arise, because the Charter is the more recent and more authoritative law. See *State v. Sodders*, 255 Kan. 79, 83, 872 P.2d 736 [1994]) (where there is conflict between two statutes, the latest legislative expression ordinarily controls). This method is how many inconsistent laws are harmonized, and the citizens of the Unified Government are not disadvantaged by using this method. Thus, all § 6.01 in Resolution R-1-97 did was state how the new government would affect prior City and County laws which were inconsistent with the Charter—it would not recognize them. As such, Resolution R-1-97 only deals with one subject—how the new government affects prior law. See *City of Kansas City v. Tipton*, 193 Kan. 651, 653, 396 P.2d 350 (1964) (city ordinance contained more than one offense but all related to traffic so the ordinance was found not to have more than one subject—traffic).

The legislative purposes behind K.S.A. 12-3004 include "the prevention of a matter of legislative merit from being tied to an unworthy matter, the prevention of hodge-podge or log-rolling legislation, the prevention of surreptitious legislation, and the lessening of improper influences which may result from intermixing objects of legislation in the same act which have no relation to each other." *Garten Enterprises, Inc. v. City of Kansas City*, 219 Kan. at 622. " ' "Log-rolling" refers to a situation in which several legislators combine their unrelated proposals and present them as separate provisions of one bill. [Citation omitted.]' " *U.S.D. No. 229 v. State*, 256 Kan. 232, 268, 885 P.2d 1170 (1994), *cert. denied* 515 U.S. 1144 (1995).

Section 6.01 in Resolution R-1-97 does not implicate these concerns. It did not tie a matter of legislative merit to an unworthy matter. It did not hodge-podge or log-roll legislation or intermix objects which have no relation to each other. Instead, it simply stated the effect that the new government would have on prior City ordinances and County resolutions—it would not affect them at all, and they would still continue in full force, unless they conflicted with the Unified Government's Charter. In the case of a

conflict, the general rules of legislative construction govern, and the more recent enactment—the Charter—would control over the older City ordinances and County resolutions that conflict with the Charter.

The Plan, which the electorate voted on, made it clear that the Unified Government would take control of the City's ordinances and the County's resolutions. The Resolution at issue, indicating that the new Unified Government would not affect prior laws passed by the City or the County unless they were inconsistent with the Charter, was published in a paper of general circulation on October 14, 1997. It is true that § 6.01 in Resolution R-1-97 did not specifically state which prior laws would no longer be effective, due to their inconsistency. However, all prior laws which are inconsistent with latter laws are no longer effective or applicable to the extent that the laws conflict. This is so, even if the prior law was not specifically repealed or specifically mentioned as a conflicting law in the latter law. The citizens of the City and the County were put on notice that this would be the manner in which conflicting law would be handled.

The Resolution did not adopt prior City and County laws but simply explained the Unified Government's effect on them. The Unified Government did not change the effectiveness of the prior City and County laws, except those which conflicted with the Charter. The Unified Government simply took over the administration of these prior consistent laws, as authorized in the Plan and the Act. ("Immediately upon swearing-in of the Unified Board of Commissioners and the County Chief Executive/Mayor, all authority inherent in existing County Resolutions and City Ordinances will transfer to the Unified Government.") Thus, most prior City and County laws are still effective, and the Unified Government has the power to administer and enforce them. As such, the Unified Government has been properly conducting business under valid ordinances and resolutions.

This issue fails. See *U.S.D. No. 229 v. State*, 256 Kan. at 268-69 ("'Article 2, § 16, of the Kansas Constitution [and by analogy, K.S.A. 12-3004] should not be construed narrowly or technically to invalidate proper and needful legislation, and where the subject

of the legislation is germane to other provisions, the legislation is not objectionable as containing more than one subject . . . . This provision is violated only where an act of legislation embraces two or more dissimilar and discordant subjects that cannot reasonably be considered as having any legitimate connection with or relationship to each other.' ") (Quoting *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, Syl. ¶ 8, 831 P.2d 958 [1992]).

## X. ESTABLISHMENT OF AN ETHICS COMMISSION

The Plan, which the voters adopted, recommended the creation of an Ethics Commission within the Unified Government, so as to guard against unethical behavior in the Unified Government. The Plan required that the Unified Board of Commissioners draft and adopt a Code of Ethics. Under the Plan, the Ethics Code would apply to all elected officials and any appointed board and/or committee members as the Unified Legislature would include. If a member of the Unified Government is found to have violated the Ethics Code, the Plan gave the Ethics Commission the power to recommend to the Unified Board of Commissioners the action which should be taken against such violator. The Commission also has the power, under the Plan, to subpoena and swear in witnesses and the power to censure those in violation of the Ethics Code.

Significantly, the Plan set out that members of the Ethics Commission shall be appointed by the administrative judge of the district court, with the consent of the sitting district judges of Wyandotte County. The judges of the district court, through the administrative judge of the county, not only have the power to appoint the members of the Ethics Commission, but also the power to dismiss them.

Courts in Kansas are vested with judicial power, which is the "power to hear, consider and determine controversies between rival litigants." *State, ex rel., v. Mohler*, 98 Kan. 465, 471, 158 Pac. 408 (1916), *aff'd* 248 U.S. 112, 63 L. Ed. 153, 39 S. Ct. 32 (1918); see *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, Syl. ¶ 5, 845 P.2d 676 (1993) ("[t]he judiciary interprets, explains, and applies the law to controversies."). Courts are limited to the exercise of judicial power in interpreting and applying the law and may not usurp the

legislative power of determining policy matters or the executive power of implementing such policy. *State v. Brady*, 156 Kan. 831, 843, 137 P.2d 206 (1943) (court's role in implementing death penalty and clemency issues). Conversely, while the legislature may enact laws which confer jurisdiction on the court or impose judicial functions on the court, it cannot impose a legislative or administrative function on the courts, except for such functions relating to court administration. To do so would constitute a violation of the separation of powers doctrine by the legislature because it would be requiring the judicial branch—the courts—to exercise legislative or executive power. *Copeland v. Kansas State Board of Examiners in Optometry*, 213 Kan. 741, 743, 518 P.2d 377 (1974); *Lira v. Billings*, 196 Kan. 726, 730-31, 414 P.2d 13 (1966).

The power of appointment does not exclusively vest in the legislative, executive, or judicial branch. Since the constitution does not assign this power to any particular branch, it falls under the realm of the legislature. Thus, the legislature may delegate this power of appointment to the judicial branch without violating the separation of powers doctrine. *Leek v. Theis*, 217 Kan. 784, 539 P.2d 304 (1975); see also K.S.A. 19-601 and K.S.A. 19-620 (providing for the judicial appointment of a county auditor through a legislative act). In *Sartin v. Snell*, 87 Kan. 485, 125 Pac. 47 (1912), this court addressed the constitutionality of a legislative enactment which created the office of county auditor and delegated to the district court in the county the power to appoint a person to fill the office. This court held that the act was a valid exercise of legislative authority. In so holding, the court stated:

"The constitution contains no inhibition upon the power of the legislature to provide as it may deem best the method for the appointment of officers whose election or appointment is not otherwise provided for. On the other hand, the constitution expressly declares that 'all officers whose election or appointment is not otherwise provided for, shall be chosen or appointed as may be prescribed by law.' (Const. art. 15, § 1.) It will thus be seen that the constitution has placed in the legislature the power to regulate the mode of appointing officers not otherwise provided for. In view of the power thus expressly conferred upon the legislature it seems unnecessary to refer specially to cases from other states, though numerous decisions might be cited where, under constitutions similar to ours, the authority of the legislature to confer upon judges and courts the power to appoint inferior

officers whose duties have no connection with the functions of courts is recognized. [Citations omitted.]

"Upon the question whether the power to appoint to office is a legislative, executive, or judicial function the late Mr. Freeman, in a monographic note to *People v. Freeman*, 80 Cal. 233, 22 Pac. 173, used the following language:

" 'The truth is, that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive, or the judicial department. It is commonly exercised by the people, but the legislature may, as the law-making power, when not restrained by the constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose. It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the legislature, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.' (13 Am. St. Rep. 122, 130.)

"It is apparent, therefore, that it is a valid exercise of legislative authority to impose upon the judge of the district court the power of appointing a county auditor." 87 Kan. at 494-95.

Here, the Plan's delegation of appointment power to the court was not proper because it was done through a city-county enactment.

However, the appointment provision is severable from the Plan. *Sedlak v. Dick*, 256 Kan. 779, 803, 887 P.2d 1119 (1995), discussed the rules for severability:

"In *Thompson v. K.F.B. Ins. Co.*, 252 Kan. 1010, 1023, 850 P.2d 773 (1993), we stated the test to be applied:

' "Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent." ' (Quoting *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 [1958]).

"We further quoted *State, ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, 372, 343 P.2d 234 (1959):

'The rule is stated very clearly in the early case of *Central Branch U.P.R. Co. v. Atchison, T. & S.F.R. Co.*, 28 Kan.° 453 (1882), in which it was held:

' "While it is undoubtedly true that a statute may be constitutional in one part, and unconstitutional in another, yet this rule obtains only where the two parts are separate and independent; and where they are so related that the latter is a condition of, a compensation for, or an inducement to, the former, or where it is obvious that the legislature, having respect to opposing rights and interests, would not have enacted one but for the other, then the unconstitutionality of the latter avoids the entire statute." (Syl 1.)' 252 Kan. at 1023-24[, 850 P.2d 773.]"

Here, the appointment provision was not so important that the Act, and the Plan as a part of it, would not have been passed by the legislature or approved by the voters without it. The Plan's provision, which required the court to delegate members to the Ethics Commission, was not an inducement for consolidation. Even without this provision, the Act, with the Plan, would have still operated to effectively carry out the intention of the legislature and the voters—that being consolidation of the local governments of Wyandotte County and Kansas City, Kansas. Plus, the Plan still would have provided for the Ethics Commission in the Unified Government; it simply would have provided a different method for appointment of the Ethics Commission members.

The provision of the Plan at issue, which delegated an Ethics Commission appointment power to the court, is separate and independent from the rest of the Plan and can be severed without doing violence to the legislative intent behind the Plan and the Act. This provision is severed, and this issue fails.

The relator's petition in quo warranto is denied. K.S.A. 1997 Supp. 12-340 *et seq.* is upheld as constitutional.