Jack Brier, President Kansas Development Finance Authority 700 S.W. Jackson Street, Suite 1000 Topeka, Kansas 66603-3761
Dear Mr. Brier:
As president of the Kansas Development Finance Authority, you pose two questions for our consideration. Your first question is:
 "1. Does the [Kansas Development Finance Authority] Act confer upon the [Kansas Development Finance] Authority, in a manner that is not an unconstitutional delegation of legislative power, the discretion to determine the use of state and local tax revenues deposited in the redevelopment bond fund to (a) pay debt service on bonds issued pursuant to K.S.A. 1999 [2000] Supp. 74-8905(e), (b) pay any portion of such revenues directly to, or on the order of, a development to defray the costs of a `project of statewide as well as local importance' and/or (c) direct that any moneys not used for such purposes be remitted back to state and local taxing authorities?"
 The Development Finance Authority Act
To appreciate the issues you raise, initially your questions must be placed within statutory context. The Kansas Development Finance Authority (Authority) was created in 1987, through enactment of the Development Finance Authority Act[1] (Act), to be a "state-wide multiple-purpose bond issuing authority" that would provide an alternative means of financing capital improvements for state agencies and economic development projects in the private sector.[2] The Act was amended in 1998[3] and 1999[4], in part, to establish a process for the Authority to designate redevelopment districts and adopt redevelopment plans. Generally, the amendments further authorize the Authority (a) to pledge certain State and local tax revenues for the issuance of bonds to finance a project of statewide as well as local importance, (b) to apply such tax revenues to the payment of costs of the project, and (c) to remit any excess tax revenues back to State and local taxing authorities. Such a project may be undertaken in one or more phases or stages by the Authority, or by a developer on behalf of the Authority, after the Authority establishes a redevelopment district and approves a redevelopment plan.[5]
The process for establishment of a redevelopment district and adoption of a redevelopment plan is multi-layered, involving participation by the Authority, a project developer, the Kansas Secretary of Commerce and Housing, and the county commissioners of the county in which a redevelopment district is proposed to be located.
The statutory process is initiated when a developer prepares a "comprehensive feasibility study, which shows the benefits derived from a project will exceed the costs and that the income therefrom will be sufficient to pay for the project."[6] The developer submits this feasibility study to the Secretary of Commerce and Housing and to the Authority.[7] A redevelopment agreement may then be executed between the Authority and the developer regarding implementation of the redevelopment plan, including the authorized extent of payment or reimbursement of all costs of the project.[8] This agreement must be approved by the board of county commissioners of the county in which a proposed redevelopment district will be located.[9] The process then moves towards the Authority's establishment of a redevelopment district and adoption of a redevelopment plan.
For the Authority to establish a redevelopment district, the Secretary of Commerce and Housing must certify that a proposed district will contain a project of statewide as well as local importance.[10] The Secretary's certification is dependent on statutorily specified parameters related to a proposed project's capital improvement costs, county population, anticipated employment positions and geographic considerations.[11] Upon the Secretary's certification, the Authority may adopt a resolution stating "its intent to establish the redevelopment district, describing the boundaries of the proposed district, and identifying any proposed projects to be considered as a part of the redevelopment district."[12] The Authority must publish its resolution and establish a public comment period, as well as mail a copy to the governing bodies of the county and the school district in which a proposed redevelopment district is located.[13] Following the public comment period, the Authority may adopt a resolution establishing the redevelopment district.[14]
For the Authority to adopt a redevelopment plan, the developer must prepare a redevelopment plan that includes a summary of the feasibility study, a reference to the redevelopment district, a comprehensive description of the project, a description and map of the area to be redeveloped, a detailed description of the buildings and facilities proposed to be constructed or improved in the area and any other information the Authority deems necessary to advise the public of the intent of the plan.[15] The developer must provide a copy of the plan to the Authority, the Secretary of Commerce and Housing and the board of county commissioners of the county in which the redevelopment district is located.[16] The county commissioners must then determine whether the plan as proposed is consistent with the comprehensive general plan for the development of the area.[17] Upon a determination of consistency by the county commissioners, the Authority may adopt the redevelopment plan by a resolution.[18] The Authority may establish the redevelopment district and adopt the redevelopment plan at the same time.[19]
Upon establishment of a redevelopment district and adoption of a redevelopment plan, the Authority may issue bonds, in one or more series, for the purpose of financing the project.[20] The bonds are to be secured by and payable from revenues from any combination of statutorily specified sources, primarily various public tax revenues.[21]
The Authority may then use the proceeds of the bonds issued, other funds pledged for the payment of such bonds and, upon approval by the board of county commissioners or other taxing subdivision in which the redevelopment district is located, any uncommitted funds from the other specified sources.[22] One category of those other sources is from certain State and local tax revenues collected by the State.[23] These tax revenues are to be remitted to the State Treasurer who is to credit such revenues to the redevelopment bond fund.[24] The Authority may use the funds from the listed sources, including the specified State and local tax revenues, the bond proceeds and other pledged funds, to implement the redevelopment plan, including the payment or reimbursement of all costs of the project to the extent authorized in the redevelopment agreement.[25] However, any excess revenue, including the specified State and local tax revenues, not otherwise needed or committed for the repayment of bonds or other project costs authorized in the redevelopment agreement shall upon approval by the Authority be paid out by the State Treasurer proportionately to the appropriate taxing authorities."[26]
Thus, it can be seen that the Act confers upon the Authority discretionary power to:
 • determine whether and on what terms to issue bonds payable from specified State and local tax revenues (as well as other public and private funds) and define the extent to which the specified state and local tax revenues will be used to pay debt service (principle and interest) on the bonds;
 • define the extent to which specified State and local tax revenues (as well as other public and private funds) will be used to pay the costs of a project; and
 • approve payment of excess State and local tax revenues to appropriate taxing authorities.
The first question you pose is whether the granting of these powers to the Authority amounts to an unconstitutional delegation of legislative power.
 The Delegation Issue Standard of Review
Your first question presents an issue under the Kansas Constitution and thus at the outset we are mindful of the appropriate standard of review.
"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt."[27]
 Delegation
Your question, framed as a possible unlawful delegation of legislative authority issue, falls within the separation of powers doctrine analysis under Article 2, § 1 of the Kansas Constitution which provides: "The legislative power of this state shall be vested in a house of representatives and a senate."
"The basic meaning of the separation of powers doctrine is that the whole power of one department should not be exercised by the same hands which possess the whole power of either of the other departments. Generally, while neither the federal nor Kansas constitution speaks directly to the doctrine of separation of powers, it has been recognized that the very structure of the federal and state systems of government gives rise to the doctrine.
"It does not necessarily flow that an entire and complete separation is either desirable or was ever intended by the framers of the constitution. One department may overlap onto another. Although early decisions insisted on complete separation, later decisions have allowed a certain degree of blending or admixture of the three powers. An absolute separation of powers is impossible.
"Generally, case law addressing the separation of powers doctrine involves one of two subdivisions: (a) the unlawful delegation of legislative authority to another branch of government and (b) the usurpation of the powers of one branch by another branch."[28]
Your question involves the subdivision relating to the unlawful delegation of legislative authority to another branch of government,i.e., to the Authority, an executive branch agency.[29] The current status of Kansas law on this issue was presented in a case recently decided by the Kansas Supreme Court.
"Legislative power is the power to make a law, as opposed to the power to enforce a law. A legislature may try to delegate the legislative power to make a law. Such a delegation is improper, unless specific constitutional authority allows the legislature to delegate its legislative power to a different branch of government. If the constitution does not authorize a delegation of such legislative power, then the delegation is improper as a violation of the separation of powers doctrine and Art. 2, § 1, which vests legislative power with the legislature only. However, a legislature may delegate an administrative power to a different branch of government. Administrative power is the power to administer or enforce a law, as opposed to the legislative power to make a law. The legislature does not need constitutional authority to delegate administrative power because it is not delegating a power reserved for its branch of government under Art. 2, § 1.
"It is often difficult to determine if the legislature has delegated the legislative power to make a law or the administrative power to administer a law. The difference between the two types of delegatedpowers depends upon the amount of specific standards included within thedelegation. If the legislature has included specific standards in a delegation, then it has already enacted the law and it is simply delegating the administrative power to administer the law, based on the standards included in the delegation. On the other hand, if the legislature has not included specific standards within a delegation, then the legislature has delegated the legislative power to make the law. Such delegation is improper without constitutional authorization.
"A delegated power constitutes administrative power if the delegation contains sufficient policies and standards to guide the nonlegislative body in exercising the delegated power. In other words, the legislature may enact general provisions and delegate to an administrative body the discretion to `fill in the details' if the legislature establishes `reasonable and definite standards to govern the exercise of such authority.'
"What is required is that a statute express the law in general terms and delegate the power to apply it to an executive agency under standards provided by the legislature. This has been the fundamental rule since early statehood."[30]
Thus, the issue you present becomes: Does the discretion (i.e. power or authority) to determine the use of specified State and local tax revenues deposited in the redevelopment bond fund include sufficient standards to guide the nonlegislative body (i.e. the Kansas Development Finance Authority) in exercising the delegated power? If adequate standards do exist to guide the Authority in its discretion to determine the use of specified State and local tax revenues, then administrative authority has been delegated in a constitutionally permissible manner. However, if such standards do not exist, legislative authority has been unconstitutionally delegated.
You ask about the Authority's discretionary determinations in relation to three separate uses of these State and local tax revenues by the Authority: (a) to pay debt service on the bonds issued, (b) to pay directly to, or on the order of a developer, for costs of a project, and (c) to direct that any excess revenue not otherwise needed or committed for the repayment of bonds or other project costs be remitted back to the appropriate State and local taxing authorities. Thus the question must be addressed in relation to these uses.
 Standards
Prior to discussing the specific issues you present, a discussion of the meaning of the term "standards" is in order. In the 1976 case ofState ex rel. Schneider v Bennett,[31] after reviewing earlier cases, the Court acknowledged that great leeway should be allowed the Legislature in setting forth guidelines or standards, and that the use of general rather than minute standards is permissible. Further, what constitutes adequate standards will of necessity depend upon the nature of the power delegated in each particular instance. The Court approved defining standards as a definite plan or pattern into which the essential facts must be found to fit before specified action is authorized. The test of the sufficiency of standards, the Court stated, was whether they are sufficiently definite and certain to enable one reading them to know his rights, obligations, and limitations thereunder.
By 1991, the Court further recognized that "we live in an increasingly complex society. To expect the legislature to have the time and expertise to deal with minute details statutorily is not realistic."[32]
Therefore, the Court said, "standards may be implied from the statutory purpose."[33] The Court ascribed to the "modern trend," which is "to require less detailed standards and guidance to the administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems."[34] Affirming these concepts in 1998, the Court added: "Where flexibility in fashioning administrative regulations to carry out statutory purpose is desirable in light of complexities in the area sought to be regulated, the legislature may enact statutes in a broad outline and authorize the administrative agency to fill in the details."[35]
 Debt Service on Bonds, Project Costs, and Remittance of Excess Revenues
As seen from the earlier discussion of the Act, the Legislature provided that specified State and local tax revenues may be used to pay debt service on the bonds issued and the project costs. These uses are authorized only after the Authority has signed a redevelopment agreement, has established a redevelopment district, and has adopted a redevelopment plan, all according to a detailed statutory process. Only then may bonds payable, in part, by specified State and local tax revenues be issued, and only then are these and other revenues available to the Authority for use in the generally prescribed manners. The Legislature did not establish whether and on what terms to issue bonds payable from these revenues, nor the method for allocating payment of these revenues between bond debt service and project costs. Consequently, the Authority must exercise discretion in making these determinations.
Further, the Legislature provided that any revenues, including the specified State and local tax revenues, not needed or committed for the payment of bonds or other project costs shall upon approval of the Authority be remitted to the appropriate taxing authorities. The Legislature did not establish the manner for determinating whether excess revenue was actually available for remittance. Consequently, the Authority must exercise discretion in making this required biannual determination of whether to approve a remittance.
These exercises of discretion are the powers that the Legislature has delegated to the Authority. If sufficient standards exist to guide the Authority in the exercise of these discretionary powers, administrative power has been delegated in a constitutionally permissible manner.
From an extensive review of Kansas case law on the issue of "unlawful delegation," we find the following cases both relevant and precedential.
In the 1954 case of State ex rel. Fatzer v. Kansas TurnpikeAuthority,[36] an unlawful delegation of legislative authority challenge was brought against the Act creating the Kansas Turnpike Authority (KTA). The Act provided for the construction, maintenance and repair of turnpike projects to be financed through revenue bonds. The primary charge was that the Act fixed no standards to guide the KTA's selection of locations for turnpike projects, and thus unlawfully delegated legislative authority. Using the analysis established in an earlier case,[37] the Court initially determined that the delegation of authority to the KTA was administrative in nature, not legislative, and that such a delegation was constitutionally permissible if reasonablyclear standards govern the exercise of the authority.
Reading the Act as a whole, the Court found sufficient standards within the purpose of the Act and the complexity of implementing it.
"Without further elaboration we are of the opinion that when the nature and magnitude of the contemplated improvement; the practicality of location of a particular toll road; the feasibility of such a project from a financial standpoint and the overall cost of such a project to be retired from revenue bonds and other income from operation are considered, that the statute does fix a reasonable standard and guide for the selection of the location of turnpike projects and for the Authority to proceed to construct such a project on the locations selected."[38]
Three years later, in State ex rel. Anderson v. Fadely,[39] an unlawful delegation challenge was brought against the State Finance Council. The charge was that the Council's authority to make allocations to, and authorize expenditures from, the State emergency fund unlawfully delegated administrative power without sufficient standards. Under the challenged statute, the Council was authorized to operate on specified, but general, conditions.[40] The Court found that while the standards provided in the statute were general in terms, they were sufficient to guide the Council's exercise of discretion.
In 1986, in Kansas Gas and Electric Co. v. State CorporationCommission,[41] an unlawful delegation claim asserted that statutory provisions did not contain reasonably clear standards to control the Kansas Corporation Commission (KCC) in the exercise of its authority. The Court, however, found that the statutes authorized the KCC to apply certain prescribed standards and requirements in setting rates for the various utilities.
"These various statutes grant to the KCC broad authority to do all things necessary and convenient for the establishment of just and reasonable rates in order to maintain reasonably sufficient and efficient service from electric public utilities."[42]
In holding the standards to be sufficient, the Court noted the KCC's vast expertise in the field and specifically stated that the KCC "of necessity, must be afforded a wide discretion in the methodology to be utilized in approaching the complex problems involved."[43]
The 1998 case of State ex rel. Tomasic v. Unified Government ofWyandotte County/ Kansas City, Kansas[44] presented an unlawful delegation challenge to the statute authorizing a commission to propose a plan for the unification of the city and county governments. The statute set forth specific items the commission was required to provide for in the plan, should it recommend consolidation. However, although the items were listed specifically, the parameters for each item were very general.[45]
The Court once again noted it was "dealing with a complex area of law involving social and economic issues,"[46] and then reached back to a quote from the 1947 Hines case:
 "Standards are difficult to define because of the variable nature thereof. They have been referred to as conditions, restrictions, limitations, yardsticks, guides, rules, broad outlines and similar synonymous expressions hereinafter set forth."[47]
The Court held that when read as a whole, the Act `s broad outline set forth sufficient standards to allow the Commission to draft a plan for the voters of Wyandotte County to adopt or reject.
"The standards which the legislature provided in the Act herein were definite and sufficient so to guide the Commission in determining if consolidation should occur and, if so, how much information should be included in the Plan. Such standards defined the parameters of the Commission's discretion. It would have been both impractical and unnecessary for the legislature to have provided more detail in the Act when it delegated the power at issue to the Commission. Instead, the legislature directed the Commission, as an administrative agency, to utilize administrative power and `fill in the details' within the definite outline set forth in the Act. The Act is not an unconstitutional delegation of legislative power to an administrative agency."[48]
In another 1998 unlawful delegation case, Citizens' Utility RatepayerBoard v. State Corporation Commission,[49] the Court found that the Act at issue provided a declaration of policies and purposes which included universal service, improved competition, and protection against fraud. Based on these policies, the Court held, the Legislature created a broad general framework with definite standards, and then delegated to the KCC the power to fill in the details, in order to effect the policies which had already been set out.
The Court recognized that the standards did leave some discretion to the KCC to determine exactly how a Kansas Universal Service Fund assessment and payout should occur. However, again recognizing the necessity of a specialist agency to address complex economic and social issues, the Court found that this grant of discretion did not make the statute a delegation of legislative power, as opposed to administrative power.
"It has long been recognized that public utility regulation, especially regulation of telecommunications, differs in respect to the regulation of other subject matters. The difficulty in understanding the terms, the technology, the funding mechanisms, as well as the importance of the telecommunications field, all require a specialized agency with particular knowledge in the telecommunications field to monitor the industry."[50]
In agreement with the Court of Appeals, the Kansas Supreme Court found that when the Legislature delegated to the KCC the power to create, fund, and administer the Kansas Universal Service Fund, the Legislature included sufficient guidelines and standards within the Act to direct the KCC in exercising this power.
In keeping with the "modern trend," the Legislature enacted the Kansas Development Finance Act in a broad outline and authorized the Authority to fill in the details, providing the Authority with general guidelines rather than minute standards. The Act is clearly designed to facilitate the administration of laws by an agency with specialized expertise in an area of complex social and economic issues, that of large scale economic development, by an specialist agency with expertise in that area. The Act as a whole provides a plan or pattern that is sufficiently definite and clear for the Authority to know its rights, obligations and limitations. The purpose of the Act is to establish a bond issuing authority to provide an alternative means of financing economic development projects in the private sector. Sufficient standards may be implied from the purpose of the Act to guide the Authority in exercising its discretionary decision-making powers. Read as a whole and considering the nature and magnitude of a project of statewide as well as local importance, the practicality of location for such a project, the financial feasibility and the cost, sufficient standards are found within the Act's purpose and in the complexity of its implementation.
In conformance with the appropriate standard of review and applicable case law, in our opinion the Authority's discretion to determine the use of specified State and local tax revenues to pay bond debt service, project costs and to determine whether to approve remittances to taxing authorities includes sufficient policies and standards to guide its exercise of delegated power. Thus, administrative, not legislative, power has been delegated to the Authority.
In conclusion and specifically in response to your first question, the Act constitutionally delegates administrative (and not legislative) power to the Authority to determine the use of State and local tax revenues deposited in the redevelopment bond fund to (a) pay debt service on bonds issued pursuant to K.S.A. 2000 Supp. 74-8905(e), (b) pay any portion of such revenues directly to, or on the order of, a development to defray the costs of a "project of statewide as well as local importance" and (c) direct that any moneys not used for such purposes be remitted back to State and local taxing authorities.
 The Appropriation Issue
The second question you pose is:
 "2. Are the tax revenues set out in 74-8924(a) available, without a specific appropriation of such moneys from the state treasury by law, to pay debt service on bonds issues pursuant to K.S.A. 1999 [2000] Supp. 74-8905(e) and to directly pay or reimburse to a developer the costs of a `project of statewide as well as local importance'?"
As indicated earlier, the Development Finance Authority Act provides that certain State and local tax revenues[51] "shall be remitted to the state treasurer" who "shall credit all such revenues to the redevelopment bond fund which is hereby established in the state treasury."[52]
Additionally, revenues from specified real property tax increments are also required to be paid by the county treasurer to the State Treasurer for deposit in the redevelopment bond fund.[53] These revenues may be pledged by the Authority for the repayment of bonds issued under the Act for the purpose of financing a project of statewide as well as local importance in connection with an redevelopment plan[54] and for payment of costs associated with such project.[55]
In relation to these tax revenues, the Act further provides:
 "The state treasurer shall make such biannual distributions[56] on dates mutually agreed upon by the treasurer and the authority."[57]
The issue you present calls into question the applicability of Article 2, Section 24 of the Kansas Constitution:
 "No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law."
K.S.A. 2000 Supp. 74-8927(b) creates the redevelopment bond fund and specifies that it is to be established in the state treasury. Article 2, Section 24 clearly requires an appropriation before money in that fund may be drawn from the treasury.[58] The language and requirements in K.S.A. 2000 Supp. 74-8927(b) may be contrasted with that found in K.S.A. 2000 Supp. 74-8905(h), allowing for certain moneys received by the Authority to treated as cash funds, not deposited with the State Treasurer for placement in the state treasury, and not subject to appropriation.
In conclusion and specifically in response to your second question, the tax revenues set out in K.S.A. 2000 Supp. 74-8924(a) must be appropriated by the Legislature before becoming available to pay debt service on bonds issued pursuant to K.S.A. 2000 Supp. 74-8905(e) and to directly pay or reimburse to a developer the costs of a project of a statewide as well as local importance. An initial, no limit appropriation with a savings clause would be sufficient for this purpose.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Camille Nohe Assistant Attorney General
CJS:JLM:CN:jm
[1] L. 1987, ch. 57, §§ 1-16.
[2] Minutes, Senate Committee on Economic Development, February 11, 1987, Attachment III; February 26, 1987, April 1, 1987, Attachment III.
[3] L. 1998, ch. 199.
[4] L. 1999, ch. 158.
[5] K.S.A. 2000 Supp. 74-8921(c) and (d); 74-8922; 74-8923.
[6] K.S.A. 2000 Supp. 74-8921(f).
[7] Id.
[8] Id.; K.S.A. 2000 Supp. 74-8923.
[9] K.S.A. 2000 Supp. 74-8921(f).
[10] K.S.A. 2000 Supp. 74-8921(b).
[11] K.S.A. 2000 Supp. 74-8902(q).
[12] K.S.A. 2000 Supp. 74-8921(c).
[13] Id.
[14] Id.
[15] K.S.A. 2000 Supp. 74-8922(a).
[16] K.S.A. 2000 Supp. 74-8922(b).
[17] Id.
[18] Id. Should a board of county commissioners find the proposed plan is not consistent with the comprehensive general plan, the board may provide comments and objections to the Authority. The Authority may then modify, approve or deny the plan.
[19] K.S.A. 2000 Supp. 74-8922(b).
[20] K.S.A. 2000 Supp. 74-8905(e).
[21] K.S.A. 2000 Supp. 74-8924. Specifically, (1) property tax increments allocated to, and paid into a special fund of the authority under the provisions of K.S.A. 2000 Supp. 74-8925, and amendments thereto; (2) revenues of the authority or the developer derived from or held in connection with the undertaking and carrying out of any redevelopment plan under the Act; (3) any private sources, contributions or other financial assistance from the State or federal government; (4) revenue collected by the State under K.S.A. 2000 Supp. 74-8927, and amendments thereto; (5) a portion or all increased revenue received by any city from franchise fees collected from utilities and other businesses using public right-of-way within the redevelopment district; (6) a portion or all of the revenue received from sales taxes collected within the redevelopment district pursuant to K.S.A. 12-187, and amendments thereto.
[22] K.S.A. 2000 Supp. 74-8923.
[23] Id.; K.S.A. 2000 Supp. 74-8924(a)(4); 74-8927(a). Specifically the revenues are all revenue from the state transient guest tax, any revenue from a county or countywide retailers' sales tax, the state retailers' sales tax, and the state compensating use tax which have been certified by the director of taxation to have been derived from taxpayers located in the redevelopment district.
[24] K.S.A. 2000 Supp. 74-8927(a).
[25] K.S.A. 2000 Supp. 74-8923; 74-8927(b).
[26] Id.
[27] State ex rel. Tomasic v. Unified Government of WyandotteCounty/Kansas City, Kansas, 264 Kan. 293, 300 (1998) (citations omitted).
[28] State v. Ponce, 258 Kan. 708, 711-12 (1995). (Citations omitted.)
[29] "The board of directors of the authority shall consist of the five members to be appointed by the governor." K.S.A. 2000 Supp.74-8903(b).
[30] Tomasic, 264 Kan. at 303-04 (emphasis added and citations omitted).
[31] 222 Kan. 11 (1977).
[32] Guardian Title Co. v. Bell, 248 Kan. 146, 153 (1991).
[33] Id., at 154.
[34] Id., at 154.
[35] Tomasic, 264 Kan. at 305.
[36] 176 Kan. 683 (1954).
[37] State ex rel. Donaldson v. Hines, 163 Kan. 300 (1947).
[38] State ex rel. Fatzer v. Kansas Turnpike Authority,176 Kan. 683, 689 (1954) (emphasis added).
[39] 180 Kan. 652 (1957).
[40] "(1) The `preservation of the public health and the protection of persons and property from extraordinary conditions arising after, or which were not forseen at the time, appropriations were made by the preceding regular legislative session'; (2) repair or temporarily replace any state building or equipment `destroyed or damaged by sabotage, fire, flood, wind, tornado, catastrophe or act of God if such building or equipment is absolutely necessary for carrying out the function of the state agency'; and (3) to supplement a fund or account of a state agency for the remainder of the current fiscal year after adjournment of a budget session if the same was recommended in the governor's budget report to the budget session and not provided for by it." Id., at 664.
[41] 239 Kan. 483 (1986).
[42] 239 Kan. at 495.
[43] Id., at 495 (emphasis added).
[44] 264 Kan. 293 (1998).
[45] E.g., "[T]he plan shall include a description of the form, structure, functions, powers and officers and the duties of such offices recommended in the plan." K.S.A. 2000 Supp. 12-344(b)(1).
[46] Id., at 305.
[47] 264 Kan. at 306 (emphasis original), quoting from Hines, supra
at 309.
[48] Id., at 307.
[49] 264 Kan. 363 (1998).
[50] Id., at 402-03.
[51] Revenue from the State transient guest tax, certain revenues from a county or countywide retailers' sales tax, revenues from the State retailers' sales tax and revenues from the State compensating use tax pursuant to K.S.A. 2000 Supp. 74-8924(a)(4); from a portion or all of the revenue received from sales taxes collected within the redevelopment district pursuant to K.S.A. 12-187 and amendments thereto pursuant to K.S.A. 2000 Supp. 74-8924(a)(6).
[52] K.S.A. 2000 Supp. 74-8927 (emphasis added). See also 74-8929; 12-187; 12-189.
[53] K.S.A. 2000 Supp. 74-8925.
[54] K.S.A. 2000 Supp. 74-8905(e); 74-8924(b).
[55] K.S.A. 2000 Supp. 74-8923; 74-8927.
[56] Funds distributed are to be used for payment of costs of a project of statewide as well as local importance and for payment of bonds. K.S.A. 2000 Supp. 74-8927.
[57] K.S.A. 2000 Supp. 74-8923; 74-8927.
[58] See Panhandle Eastern Pipe Line Co. v. Fadely, 189 Kan. 278, 286
(1962); The State, ex rel., v. Stover, 47 Kan. 119, 121-124 (1891). We note that this situation is unlike that reviewed by the Court in State exrel. Boynton v. Kansas State Highway Commission[59] 
[59] 139 Kan. 391 (1934).